**Harold W. PARKS and Roger Armstrong**

v.

**The UNITED STATES.**

**No. 721–86C.**

United States Claims Court.

July 15, 1988.

Thomas J. Williams, Fort Worth, Tex., for plaintiffs.

Tamra Phipps, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

MARGOLIS, Judge.

Plaintiffs brought this action seeking to overturn a U.S. Department of Agriculture (USDA) finding that plaintiffs were not eligible for payments under the Milk Diversion Program, 7 U.S.C. § 1446(d), and requiring plaintiffs to refund all monies already received under the program. Plaintiffs also challenge the USDA's decision to levy a $1,000 civil penalty against each of the plaintiffs for failing to comply with the terms of their Milk Diversion contracts. Defendant counterclaims, seeking the return of all monies paid to the plaintiffs under their Milk Diversion contracts plus interest, together with the civil penalty. There being no dispute as to the material facts of this case, the defendant has filed a motion for summary judgment, and the plaintiffs have cross moved for summary judgment.

After a careful review of the administrative record and after hearing oral argument, the court concludes that the USDA did not abuse its discretion in determining that plaintiffs were ineligible to receive payments pursuant to their USDA contracts and in levying a civil penalty against each plaintiff. Accordingly, the defendant's motion for summary judgment is granted, and the plaintiffs' cross motion for summary judgment is denied.

## FACTS

The Milk Diversion Program (MDP), 7 U.S.C. § 1446(d), is a price support program administered by the USDA. The program's objective is to reduce the total amount of milk produced in the United States in an effort to stabilize market prices. Under the program, the Commodity Credit Corporation (CCC) is authorized to enter into contracts with eligible milk producers to reduce their milk production. *See id.* § 1446(d)(2)(B), (d)(3).

Under these contracts, milk producers agree to reduce their milk marketings during the contract period from between five to thirty percent below base period marketings, which are established for each pro-

ducer. 7 U.S.C. § 1446(d)(3), 7 C.F.R. §§ 1430.400–.420. The producer may select a percentage decrease in production from within that range. The selected percentage decrease then becomes a term of the contract. 7 U.S.C. § 1446(d)(3)(A)–(B); 7 C.F.R. § 1430.408. Provided that the producer reduces milk marketings by the selected percentage during the term of the contract and complies with all other terms and conditions of the program, the CCC agrees to pay $10 per hundredweight (for the 1984–85 contract period at issue) for the producer's achieved reduction. 7 U.S.C. § 1446(d)(3)(C); 7 C.F.R. §§ 1430.409, 1430.412. If, during the term of the contract, the producer fails to reduce milk marketings to within three percent of the agreed upon percentage, the producer is not entitled to any payments under the contract, 7 U.S.C. § 1446(d)(3)(D); 7 C.F.R. §§ 1430.408, 1430.412, and, may also be subject to a marketing penalty for such failure, 7 U.S.C. § 1446(d)(5)(B); 7 C.F.R. § 1430.415(a).

The MDP contract provides that preliminary milk diversion payments are to be made on a quarterly basis. The contract specifies that these quarterly payments are conditional payments subject to return if the terms of the contract are not satisfied. The contract also provides that any producer who "has adopted or participated in any practice which tends to defeat the purpose of the program, ... shall be ineligible for payments under the contract and shall refund to CCC all payments received by the producer under the contract together with interest."

Plaintiff Harold W. Parks and plaintiff Roger Armstrong both operate dairies in Erath County, Texas. Both entered into MDP contracts agreeing to a thirty percent reduction in production below their established base levels of production. The contracts, which were divided into five three-month "quarters," covered a 15 month period beginning in January 1984 and ending in March 1985.

During the first two quarters of the contract term, Parks did not reduce production as agreed and, therefore, did not qualify

for payments. Armstrong, however, due to a brucellosis outbreak in his herd, was forced to sell his entire herd of 207 cows during May and June 1984. As a result of the brucellosis, Armstrong reported substantially lower milk marketings for the first two quarters of the contract. Therefore, Armstrong qualified for and received preliminary milk diversion program contract payments totalling $43,046.50 for the first and second quarters of the contract. Because Armstrong sold his entire herd of 207 cows, he was eligible to acquire and milk up to 160 cows without jeopardizing his MDP program payments of approximately $20,000 per quarter.

On September 1, 1984, Parks and Armstrong entered into a lease and employment agreement under which Parks leased 96 dairy cows to Armstrong for $5 per cow per month ($480 per month) from September 1, 1984 through March 31, 1985, the end of the plaintiffs' MPD contract period. The agreement also provided that Parks was to operate and manage the Armstrong dairy from September 1, 1984 through March 31, 1985. Under the employment agreement, Armstrong would receive the first $1,000 in gross income per month derived from the operation of the Armstrong dairy. Parks was to receive all monthly gross income in excess of $1,000. In an investigation of this arrangement, the Office of the Inspector General, USDA, estimated that the 96 cows involved in the agreement would produce approximately 160,000 pounds of milk per month. Based on the then current market price for milk of $14.38 per hundredweight, Parks would receive over $22,000 per month after taking into account lease proceeds of $480 per month and Armstrong's retention of $1,000 per month. The Inspector General calculated that Parks would retain approximately 97% percent of the proceeds of milk marketings from the Armstrong Dairy.

Further, the record indicates that in October 1984, Parks leased 35 cows for his own dairy from the Gore Brothers Dairy. Also in October 1984, Gore Brothers leased 64 cows to the Armstrong Dairy, thus bringing the Armstrong Dairy up to its MDP reduction maximum of 160 cows. Again, in exchange for managing the Armstrong Dairy, Parks was to receive either half or all of the proceeds from these 64 cows.[1] The Inspector General estimated that Parks would receive an additional $14,000 per month from the 64 cows located at the Armstrong Dairy based on local prices and production.

After the Office of the Inspector General investigated the plaintiffs' dairy operations, the County Committee of the Agricultural Stabilization and Conservation Service (ASCS) reviewed the plaintiffs' contracts on January 11, 1985. The County Committee determined that "[a]lthough the title of contract 'Dairy/Cattle Lease and Contract of Employment,' raised questions about intent of program the committee did not feel that sufficient evidence existed to deny payments" under plaintiffs' MDP contracts. Accordingly, the County Committee recommended payment to the plaintiffs subject to state office review or approval. Upon review, on January 15, 1985, the District Director for the ASCS did not agree with the County Committee's conclusion and, instead, recommended that:

> the State Committee determine that the two units be considered in violation of the MDP. The employment part of the Contract suggests that Harold Wayne Parks will possible [sic] receive benefits from the milk reduction from his unit. The movement of additional livestock to the Armstrong unit further implies that the contract is a lease of the farm/facility.

The District Director concluded that Parks had an interest in the Armstrong Dairy; that such interest violated the MDP, and that a marketing penalty might be assessed against Parks. The Texas State Committee for the ASCS, which operated the local milk diversion program on behalf of the CCC, after reviewing the Inspector General's report, the County Committee's

---

1. While the Inspector General's report indicates that Parks stated that he would receive all of the proceeds from the Gore cows, in further administrative hearings Parks indicated that the proceeds were to be divided equally between himself and Armstrong.

recommendation, and the District Director's recommendation, determined that Parks and Armstrong had engaged in a practice that tended to defeat the purpose of the program. Therefore, the State ASCS Committee ruled that both Parks and Armstrong were ineligible for payments under the program, would be required to refund all payments already made plus interest, and would have to pay a $1,000 civil penalty. For reasons not evident in the record, no marketing penalty was assessed.

Plaintiffs subsequently requested the State ASCS Committee to reconsider its decision. On March 22, 1985, the State Committee denied plaintiffs' request for reconsideration. Plaintiffs then appealed this decision to the Deputy Administrator, State and County Operations, ASCS.

On August 19, 1985, in final administrative decisions following a hearing, Thomas A. VonGarlem, the Assistant Deputy Administrator, State and County Operations, ASCS, denied the plaintiffs' applications and affirmed the State ASCS Committee's decision. VonGarlem concluded that plaintiffs took part in a scheme, device and practice that operated to defeat the purpose of the program. He reasoned that Armstrong improperly "entered into an agreement which allowed Parks, who could not qualify for quarterly MDP payments, to transfer a large number (96) of dairy animals to [Armstrong's] dairy facility for that purpose without, in fact, producing an actual reduction in milk production." Further, referring to 7 C.F.R. § 1430.409, VonGarlem concluded that "[t]his arrangement was also a violation of Mr. Armstrong's MDP contract because he allowed another producer, who was not a signatory to his contract, to use the reduced capacity of his dairy facility." VonGarlem concluded that Parks:

> effectively became the producer on the Armstrong farm. The net result of the arrangement with Mr. Armstrong was that the agreed to reduction was offset by production on the Armstrong farm. [Parks] seeks MDP payments on the ba-

sis of having simply moved the place of production. There was no real reduction in production by [Parks] and this clearly defeated the purposes of the program.

Pursuant to 7 U.S.C. § 1446(d)(5)(B), 7 C.F.R. § 1430.415, and the MPD contract itself, the USDA also assessed a $1,000 penalty against both Parks and Armstrong for failing to comply with the terms and conditions of the milk diversion program. Following this final decision, the USDA sought a refund from Armstrong of the preliminary payments, including interest since the date of payment, and late payment charges if not paid by October 5, 1985, as well as the civil penalty. The USDA also sought to collect the civil penalty levied against Parks.

Plaintiffs, in a joint complaint filed with the U.S. District Court for the Northern District of Texas, appealed the final administrative decisions. The district court concluded that the United States Claims Court had exclusive jurisdiction over this action and, pursuant to 28 U.S.C. § 1406(c), transferred this action to the Claims Court. *Parks v. Block*, No. 4–85–682–K (N.D.Tex. Nov. 5, 1986).

## DISCUSSION

### A. *Jurisdiction*

Although the parties did not raise the issue of the court's jurisdiction over the claims presented, it is well settled that the Claims Court may evaluate its own jurisdiction at any time.[2] *Berdick v. United States*, 222 Ct.Cl. 94, 99, 612 F.2d 533, 536 (1979); *Wheeler v. United States*, 3 Cl.Ct. 686, 689 (1983). Thus, the first issue for adjudication is whether the plaintiffs' claims and the defendant's counterclaim fall within the court's jurisdiction.

The Tucker Act, 28 U.S.C. § 1491(a)(1), provides that the Claims Court may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with

---

**2.** On December 8, 1987, this court on its own motion ordered the parties to brief the jurisdic-

tional issue. The parties submitted their briefs on January 15, 1988.

the United States...." For plaintiffs' claim to be cognizable in this court, it must rest on a contract, or relevant statute, or regulation that can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983); *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976); *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967).

■ Although the Claims Court has some authority to grant affirmative, non-monetary relief, this power is limited. This court can grant equitable relief only if it is associated with and subordinate to a claim for a money judgment. *Doko Farms v. United States,* 13 Cl.Ct. 48, 56 (1987). Therefore, the plaintiffs' primary claim must seek monetary relief before this court can exercise jurisdiction. *See Testan,* 424 U.S. at 397–98, 96 S.Ct. at 952–53.

■ Plaintiffs' complaint states a demand for money allegedly owed to the plaintiffs by the United States pursuant to contracts authorized under the Milk Diversion Program, 7 U.S.C. § 1446(d). Therefore, as the Tucker Act requires, the plaintiffs' claim is one for money, is against the United States, and is founded upon both an Act of Congress and an express contract. As a result, this court has jurisdiction over the plaintiffs' claim unless the Milk Diversion Program's jurisdictional provisions indicate otherwise. *See United States v. Erika, Inc.,* 456 U.S. 201, 208–09, 102 S.Ct. 1650, 1654–55, 72 L.Ed.2d 12 (1982); 28 U.S.C. § 1491(a)(1).

The jurisdictional section of the statute, 7 U.S.C. § 1446(d)(5)(A), reads as follows:

> The district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain any person from violating, any provision of this subsection or any regulation issued under this subsection. Any such civil action authorized to be brought under this subsection shall be referred to the Attorney General for appropriate action.

The court construes this jurisdictional grant as allowing the United States, and specifically the Secretary of Agriculture and Attorney General, to bring an action against any person with whom the CCC has contracted and who has allegedly violated the milk diversion statute. On the other hand, this section does not address the situation in which a person with whom the CCC has contracted brings an action against the United States. Because the statute is silent as to where jurisdiction over such an action lies, the general jurisdictional statute, the Tucker Act, controls and, therefore, such claims must be brought in the Claims Court.

■ The complaint also asks the court to "declare the respective rights and obligations of the parties." While the Claims Court is not empowered to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; *see Testan,* 424 U.S. at 397–98, 96 S.Ct. at 952–53, the Claims Court is also not bound by the labels a party selects in characterizing its action, *Wheeler,* 3 Cl.Ct. at 688 (determining whether an action sought declaratory relief, as stated by plaintiff, or whether the claim was for monetary damages). Declaratory relief is unnecessary in this case as it is duplicative of plaintiffs' claim for monetary damages. The plaintiffs have specifically stated a claim for money damages, and the defendant has counterclaimed for a refund of money and seeks assessed penalties.

■ The defendant's counterclaim presents a different jurisdictional question. The Claims Court may retain jurisdiction over certain government counterclaims pursuant to 28 U.S.C. § 1503, which provides:

> The United States Claims Court shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court.

In this case, the defendant's counterclaim includes a request for all monies paid to plaintiff Armstrong pursuant to the contract prior to the discovery of the alleged scheme and a request for a $1,000 penalty

assessed against each plaintiff for knowingly violating a provision of the Milk Diversion Program.

The Claims Court Rule 13(a) makes the assertion of certain counterclaims mandatory, providing:

Compulsory Counterclaims. The answer shall state as a counterclaim any claim which, at the time of serving the answer, the defendant has against any plaintiff, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Clearly, under its counterclaim jurisdiction and the rules of the Claims Court, this court may adjudicate the defendant's claim for the refund of monies paid to Armstrong. A question arises however as to whether the court has jurisdiction over the penalty claim. Section 1446(d)(5)(C) and (D), 7 U.S.C., indicates that the U.S. district courts have jurisdiction to review penalty claims.[3] At the same time, the penalty represents a set-off or demand that the defendant must raise before the Claims Court, and jurisdiction over the claim is specifically conferred pursuant to 28 U.S.C. § 1503.

In a similar situation, the Court of Claims, in *Brown v. United States,* 207 Ct.Cl. 768, 784–87, 524 F.2d 693, 703–04 (1975), held that 28 U.S.C. § 1503 gave the court jurisdiction over a counterclaim by the government even though the jurisdictional provision involved granted jurisdiction over the subject matter of the counterclaim to the district courts. The court cited *Cherry Cotton Mills, Inc. v. United States,* 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835 (1946), in which the Supreme Court explained that the purpose of the Claims Court's counterclaim jurisdiction was:

to permit the Government, when sued in the Court of Claims, to have determined in a single suit all questions which involved mutual obligations between the Government and a claimant against it. Legislation of this kind has long been favored and encouraged because of a belief that it accomplishes among other things such useful purposes as avoidance of "circuity of action, inconvenience, expense, consumption of the courts' time, and injustice." *Chicago & N.W.R. Co. v. Lindell,* 281 U.S. 14, 17 [50 S.Ct. 200, 201, 74 L.Ed. 670] and cases cited.

Many of the factors enumerated in *Cherry Cotton Mills* exist in the instant case. In addition to these factors, the defendant's claim for a refund from Armstrong, the plaintiffs' claim for money pursuant to the program, and the penalty claims all center on the identical issue of whether the plaintiffs entered into a scheme that tended to defeat the purpose of the program. The evidence necessary to determine the merits of all three claims is necessarily the same. The court, therefore, holds that it retains jurisdiction over the defendant's counterclaim for penalties assessed against the plaintiffs.

**B.  *Merits***

The plaintiffs are appealing a final decision of the USDA that denied plaintiffs' applications for payment under the MDP based on the conclusion that plaintiffs had taken part in a "scheme or device which tends to defeat the purpose of the program." The defendant's counterclaim seeks a refund of milk diversion payments already received by Armstrong and assessment of a civil penalty of $1,000 against each plaintiff.

The parties agree that the standard of review that this court must employ is whether the USDA's action was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "

---

**3.**  7 U.S.C. § 1446(d)(5)(C) and (D) read as follows:

(C) Any person against whom a penalty is assessed under subparagraph (B) may obtain review of such penalty in an appropriate district court of the United States ...

(D) The district courts of the United States shall have jurisdiction to review and enforce any penalty imposed under subparagraph (B).

*Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 238 (8th Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed. 2d 733 (1976) (citations omitted). The scope of the inquiry permitted under this standard is confined to the administrative record. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). *De novo* review is not permitted. *Hilo Coast Processing Co. v. United States,* 7 Cl.Ct. 175, 176 (1985). Instead, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), requires a "thorough, probing, in-depth review" of the agency action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971); *Independent Meat Packers Ass'n,* 526 F.2d at 238.

While the court "is not empowered to substitute its judgment for that of the expert agency," the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). The agency construction need not be " 'the only reasonable one, or even ... the result a court would have reached.' " Instead, " 'the judicial function is exhausted when there is found to be a rational basis for the [administrative] conclusions.' " *Nabisco, Inc. v. United States,* 220 Ct.Cl. 332, 340, 599 F.2d 415, 419 (1979) (quoting *Port Authority of St. Paul v. United States,* 193 Ct.Cl. 108, 120, 432 F.2d 455, 461 (1970)); *accord Carruth v. United States,* 224 Ct.Cl. 422, 437, 627 F.2d 1068, 1076 (1980).

■ The administrative record indicates that Parks and Armstrong entered into separate MDP contracts under which they each promised to reduce their production of milk by thirty percent. Armstrong almost immediately reduced his production by 100%, not in order to comply with his MDP contract, but because he was forced to sell all of his cows after they contracted brucellosis. As a result, his facility was not producing milk, thereby qualifying him for full payments under his MDP contract and making him eligible to acquire up to 160 cows and still receive MDP payments. The record also indicates that Parks' facility was producing too much milk to qualify for any payments under his MDP contract. To resolve this situation, Parks entered into a contract with Armstrong that allowed Parks to lease 96 of his cows to the Armstrong Dairy so as to reduce the amount of milk production by the Parks Dairy.

MDP regulations allow the lease of dairy cows if the lease is to another producer who has executed a milk diversion contract with the CCC. 7 C.F.R. § 1430.410(a). However, the contract between Parks and Armstrong also allowed Parks to retain all of the profits from the 96 cows exceeding $1,000 per month. This arrangement allowed Parks to earn a profit of about $22,-000 for the month of September 1984 from his leased cows as an "employee" of the Armstrong Dairy. Under the employment agreement, which allowed Parks to manage the Armstrong Dairy, Parks was also able to maintain total control over his 96 cows. In October 1984, following the lease of the Gore Brothers' cows, Parks was in a position to receive as much as $36,000 in milk marketings for the month of October from the Armstrong Dairy. Armstrong, on the other hand, would receive only $520 per month ($1,000 in proceeds minus $480 in lease payments to Parks) from the operation of his dairy, plus $20,000 per quarter in milk diversion payments.

While on its face the lease agreement between Parks and Armstrong is seemingly allowable under the regulations, the aspect of the agreement that designates Parks as an "employee" of Armstrong and allows Parks to retain almost all of the profits from and control of the 160 "leased" cows, seriously draws into question the true nature of the transfer.

As the basis for denying Armstrong payments under his MDP contract, the ASCS relied on 7 C.F.R. § 1430.409(a)(3), which provides:

> Any production capacity of a milk facility that becomes available for use because a

producer reduces milk production *in order to comply with the terms and conditions of the contract* shall not be used by the producer, or made available by the producer for use by any other person, for the production of milk.

(emphasis added). However, the ASCS could not have reasonably construed Armstrong to have violated this prohibition. The production capacity of Armstrong's facility did not become available because he reduced his milk production "in order to comply with [his MDP] contract." His facility became available because his dairy cows became diseased and had to be sold. Therefore, a plain reading of the regulation precludes the ASCS from concluding that Armstrong violated this prohibition.

Thus, the lease of the 96 cows to the Armstrong Dairy did not disqualify Armstrong from receiving payment under his MDP contract. As previously stated, the Armstrong facility could acquire and produce milk from up to 160 cows and still have a thirty percent reduction in milk production as compared to previous years. The arrangement between Parks and Armstrong would be within the guidelines of the MDP and regulations if Parks had simply leased his 96 cows to Armstrong without Parks being able to retain the profits from the cows, thereby becoming a producer on the Armstrong Dairy.

In this case, however, the USDA reasonably concluded that the agreement between Parks and Armstrong did not operate as a true lease of dairy cows. Instead, it functioned as a lease of Armstrong's facilities to Parks and enabled Parks to transfer a portion of his production to the Armstrong Dairy. Parks maintained complete control over the milk production of all of the cows at the Armstrong Dairy and retained all profits exceeding $1,000 per month. The $1,000 a month paid to Armstrong in effect served as a payment to Armstrong for use of his facilities by Parks. Therefore, the agreement allowed Parks to claim a reduction in production at his facility when in fact there was no true reduction in produc-

tion as Parks was simply producing milk at the Armstrong Dairy. Here, the agreement served as a vehicle to transfer a portion of Parks' milk production to the Armstrong Dairy.

Under MDP regulations, the employment contract that allowed Parks to share in the profit of his leased cows, made Parks a "producer" both on the Parks Diary *and* on the Armstrong Diary. "Producer" is defined in 7 C.F.R. § 1430.402(t) as:

> any person who is involved in, contributes to, or has any interest in any unit which is used for the production of milk and who shares in the risk and proceeds of the production of milk.

The term "unit" means "the dairy cows, milk production facilities, and land used to produce milk...." 7 C.F.R. § 1430.402(w). By virtue of the employment contract with Armstrong, Parks was "involved in" and "contribut[ed] to" the production of milk from the "leased" cows. In fact, the record indicates that Parks was in total control of the care and maintenance of the animals.[4] In addition, Parks maintained an "interest" in his cows by retaining almost all (as much as 97%) of the profits from the production of milk. As a producer on the Armstrong Dairy, the regulations credit Parks with the production of milk from the 160 cows. The statute requires that to obtain milk diversion payments, each producer must certify that a decrease in production "has not been offset by expansion of production in other production facilities in which the producer has an interest." 7 U.S.C. § 1446(d)(3)(J)(i). The USDA did not err when it concluded that Parks did not comply with this requirement, did not reduce the production of his cows and, therefore, could not qualify for milk diversion payments under his MDP contract.

Further, the lease/employment contract served only to transfer a portion of the production from the Parks Dairy to the Armstrong Dairy and at the same time to allow both Parks and Armstrong to collect milk diversion payments. To simply have the cows produce at a different facility and

4. In fact, one of the employees found on the Armstrong Dairy milking cows told auditors that he worked for Parks and had never seen Armstrong.

attempt to credit that production to a different producer does not result in an actual reduction of production. Because the purpose of the MDP is to reduce the total amount of milk produced in the United States, Parks' and Armstrong's lease agreement can very reasonably be construed as a "scheme or device which tends to defeat the purpose of the program," as no actual reduction of production was accomplished.

Pursuant to 7 C.F.R. § 1430.409(a), "in order to be eligible for diversion payments, the producer must ... comply with all of the terms and conditions of the contract and this subpart...." For the reasons stated above, the ASCS reasonably determined that plaintiffs did not comply with the terms and conditions of their contracts. Therefore, the ASCS decision not to make diversion payments to plaintiffs under their MDP contracts was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Independent Meat Packers Ass'n*, 526 F.2d at 238.

■ The regulations further provide that "[t]he producer shall refund to CCC any payments received under the contract, together with interest, if the producer fails to comply with the terms and conditions of the contract and this subpart." 7 C.F.R. § 1430.409(a)(4). The ASCS reasonably found that Armstrong failed to comply with the terms and conditions of his MDP contract. Therefore, the ASCS decision to seek a refund of any payments received by Armstrong under his MDP contract along with interest and late charges was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* While this result may seem unfair to Armstrong, who had little to gain under the lease and much to lose, the statute, regulations, and contract give abundant notice that if an attempt is made to defeat the purpose of the program, the involved parties will be required to refund all diversion program payments.

■ Finally, the regulations provide that "any producer or person who knowingly violates any provision of the Milk Diversion Program shall be liable for a civil penalty of not more than $1,000 for each violation." 7 C.F.R. § 1430.415(b). The plaintiffs argue that there is no evidence that they "knowingly" violated the provisions of the MDP. While the record does indicate that the plaintiffs did not conceal the existence and provisions of the lease and employment contract, it is the combination of the lease with the employment contract that constitutes a scheme or device that defeats the purpose of the program. The court may charge the plaintiffs in this case with the knowledge of the basic operation of the MDP. *United States v. Batson*, 706 F.2d 657, 681 (5th Cir.1983). Charged with such knowledge, a reasonable person would clearly comprehend that the lease and employment contract operated in such a manner as to defeat the purpose of the program. In this case, therefore, scienter may be imputed to the participants in such a practice.

The ASCS reasonably determined that the arrangement between Parks and Armstrong was a "scheme or device which tends to defeat the purpose of the program." 7 C.F.R. § 1430.417(b)(1). Therefore, the decision of the ASCS to terminate plaintiffs' participation in the MDP, to order a refund of the monies paid to Armstrong together with appropriate interest and late payment fees, and to levy a $1,000 civil penalty on each plaintiff was not arbitrary, capricious, an abuse of discretion, or contrary to law.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted. Plaintiffs' cross motion for summary judgment is denied. The Clerk will dismiss the plaintiffs' complaint. The parties will file with the Clerk within 45 days a stipulation of the amount of damages to which the defendant is entitled.