**Leroy H. MARTIN, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 558–88C.**

United States Claims Court.

June 29, 1990.

consequences flow to plaintiffs.

James H. Thomas, Lancaster, Pa., for plaintiff.

Mark A. Melnick, Washington, D.C., with whom were Asst. Atty. Gen., Stuart M. Gerson, Director David M. Cohen, and Asst. Director Terrence S. Hartman, for defendant.

## OPINION

LYDON, Senior Judge:

This case is before the court on the parties' cross motions for summary judgment. At issue is whether plaintiff violated the terms of his contract with the United States Department of Agriculture (USDA). The parties entered into the contract pursuant to the Diary Termination Program (DTP), which was enacted as part of the Food Security Act of 1985, 7 U.S.C. § 1446(d) (Supp. V 1987).[1] Plaintiff's complaint challenges a determination by the USDA's Deputy Administrator for State and County Operations (DASCO) that plaintiff is no longer eligible to receive compensation under the DTP, that plaintiff is still bound by the non-production terms of the contract, and that plaintiff must pay a $1,000 civil penalty for knowingly violating the DTP. The government has counterclaimed to collect the $1,000 penalty, which plaintiff has refused to pay. Neither party has requested oral argument on the summary judgment motions before the court, and the court feels that oral argument is not necessary under the circumstances present here. Based on a careful review of the administrative record, the court finds merit in the government's position.

## FACTS

In 1985, Congress enacted the Dairy Termination Program (DTP) for the purpose of reducing the overproduction of milk nationwide, by paying dairy farmers to dispose of their *lactis bovinus* (dairy cattle) and to

---

1. The regulations enacted to implement the DTP reveal that the purpose of the DTP is "to achieve reductions in the quantity of milk marketed for commercial use." 7 C.F.R. § 1430.450 (1989).

cease production of milk for at least five years. 7 U.S.C. § 1446(d) (Supp. V 1987). On March 31, 1986, plaintiff Leroy H. Martin (Martin), a dairy farmer in Lancaster County, Pennsylvania, entered into a contract with the United States Department of Agriculture (USDA), acting through the Commodity Credit Corporation (CCC), to participate in the DTP. Under the terms of the contract, Martin (the Producer) agreed:

> That all dairy cattle *on the bid date* on any unit with respect to which the Producer or any related person was a Producer on or after January 1, 1986, and any dairy cattle in which, *as of the bid date,* the Producer or any related person had an interest are listed in Items 8 and 9 of this Contract and shall together with other dairy cattle required to be disposed of by the Contract and Appendix, be sold for slaughter or export by the end of the disposal period for which the bid is accepted.

Paragraph 10(B) (emphasis added).

The contract required Martin to dispose of his herd by the end of the first disposal period, August 31, 1986, and to cease milk production for five years thereafter, for which Martin would receive payments under the DTP totaling $37,489.18. Martin alleges that, pursuant to the terms of the contract, he surrendered 18 cows that were on his farm on or after the bid date of March 5, 1986, and he has not engaged in the production of milk since that time. Having fully complied with the terms of the contract, Martin contends that he is entitled to receive compensation under the contract, totalling $37,489.18, and he challenges the government's conduct in revoking his eligibility to receive compensation under the DTP, and in failing to pay him any part of this sum, claiming such action constitutes a breach of contract.

In support of his position, Martin relies on two amended provisions in the Appendix to the DTP contract, paragraphs 6(A) and 8(B). As amended, paragraph 6(A) states:

> All dairy cattle which *on or after the bid date* were located on any unit with respect to which any participating producer or related person was a producer on or

after January 1, 1986, shall be sold for slaughter or export by the end of the contract disposal period in accordance with the provisions of paragraph 7 of this Appendix. In addition, all dairy cattle in which any such producer or related person had an interest *on or after the bid date* shall be so sold by the end of the contract disposal period.

Appendix paragraph 6(A) (emphasis added). The amendment deleted the words "as of the bid date" and substituted "on or after the bid date." Paragraph 8(B) of the Appendix was similarly amended to state, in pertinent part, as follows:

> Not later than 30 days following the end of the contract disposal period each participating producer shall file a certification showing whether the following dairy cattle have been exported or slaughtered:
>
> (i) All dairy cattle which *on or after the bid date* were on any unit with respect to which the producer or related person was a producer on or after January 1, 1986.
>
> * * * * * *

Appendix paragraph 8(B) (emphasis added).

After an agency investigation, the USDA determined that Martin had violated the provisions of his DTP contract by engaging in "cow-switching," *i.e.,* by failing to surrender those cows located on his farm on the bid date. As a result, the USDA revoked Martin's eligibility to receive any benefits under the DTP, assessed against him a civil fine of $1,000, and declared him to be still bound by the non-production terms of the contract for the remainder of the five-year period.

The events that preceded the agency investigation took place as follows. On the morning of April 16, 1986, the CCC, acting through the employees of the Agricultural Stabilization and Conservation Service (ASCS) for Lancaster County, Pennsylvania, received an anonymous telephone call stating that Martin was switching cows with a neighbor. The caller stated that he had seen a truck making several trips between Martin's farm and another farm during the night. At 4:30 p.m. that afternoon, the director of the ASCS paid a visit to the

Martin farm, and made several observations. First, the director noted that there were fewer cows on Martin's farm than Martin had indicated in his bid on March 5, 1986. Second, the director saw several cows that he believed to be too young to be able to produce milk at the levels Martin claimed in his bid. Third, the director noted that the cows appeared to be disoriented and unfamiliar with their surroundings. Based on these observations, the director requested that the USDA's Office of Inspector General (OIG) conduct an investigation of Martin.

After completion of the OIG investigation, the ASCS concluded, through its dispute resolution committee, the COC, which is composed of local farmers elected by farmers from Lancaster county, that Martin had engaged in cow-switching. The COC concluded that this activity violated the terms of the DTP contract. Consequently, the COC imposed the following sanctions on Martin: a $1,000 civil penalty, a declaration that Martin was ineligible to receive any benefits under the DTP, and a determination that Martin was still bound to adhere to the 5–year non-production terms of the contract. Upon appeal to the state committee (SOC), the COC's decision was upheld. At the final level of administrative appeal, the USDA's Deputy Administrator for State and County Operations (DASCO) reviewed Martin's case and upheld the COC's decision on August 11, 1987.

On January 1, 1988, Martin filed a complaint against the government in a federal district court in Pennsylvania, which transferred the case to the United States Claims Court on August 15, 1988. On October 18, 1988, Martin filed an amended complaint, alleging that defendant had breached the DTP contract by declaring Martin ineligible to receive compensation under the DTP. Martin seeks relief in the form of complete reinstatement into the DTP, removal of the $1,000 civil penalty, and payment of $37,-489.18 plus interest, the amount allegedly due under the contract. The government filed an answer and a counterclaim for $1,000 plus interest, the amount of the civil penalty assessed against Martin.[2]

## DISCUSSION

The issue in this case involves the meaning of language contained in certain provisions of the DTP contract. Plaintiff Martin admits that he switched three or four of his 18 cows after the bid date, thereby altering the identity of his herd after the bid date, and he concedes in his brief that, but for the amended contract provisions, "he would have been contractually bound to deliver to the government the eighteen (18) cows on his farm 'as of the bid date.' " Martin argues, however, that the provisions of Appendix paragraphs 6(A) and 8(B), as amended, do not prohibit him from altering the identity of his herd after the bid date. Martin argues that he complied with the contract terms by surrendering 18 cows that were present on his farm on or after the bid date. On the other hand, defendant argues that the express language of paragraph 10(B) of the contract clearly prohibits cow-switching and clearly obligates Martin to surrender the specific cows that were on his farm as of the bid date.

Both parties have moved for summary judgment, conceding that there are no genuine issues of material fact in dispute. The court agrees that this case can be disposed of by summary judgment, since the primary issue is one of contract interpreta-

---

2. The DTP provides for the imposition of a civil penalty of not more than $1,000 for a knowing violation of any provision of the DTP, pursuant to 7 U.S.C. § 1446(d)(5)(B)(i). *See also* 7 C.F.R. § 1430.415(b). The court has jurisdiction over the government's counterclaim for the $1,000 penalty pursuant to 28 U.S.C. § 1503. *See Parks v. United States,* 15 Cl.Ct. 183, 189 (1988). In fact, the government is required to assert against a plaintiff any counterclaim "arising out of the transaction or occurrence that is the subject matter of the opposing claim." RUSCC 13(a). In *Parks,* the Claims Court noted that 7 U.S.C. § 1446(d)(5)(C) and (D) indicate that the district courts have jurisdiction to review penalty claims, but the court concluded that "the penalty represents a set off or demand that the defendant must raise before the Claims Court, and jurisdiction over the claim is specifically conferred pursuant to 28 U.S.C. § 1503." *Parks, supra,* 15 Cl.Ct. at 189.

tion, *i.e.*, whether the DTP contract requires Martin to surrender 18 cows of unspecified identity that were located on his farm on or after the bid date, as Martin contends, or whether, as defendant contends, the 18 cows surrendered must be the same cows that were located on Martin's farm on the bid date. Contract interpretation is a question of law that may be disposed of by summary judgment. *Ralph Larsen & Son, Inc. v. United States*, 17 Cl.Ct. 39, 46 (1989), citing *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n. 1 (Fed.Cir.1988).

■ Defendant's first argument in support of its motion for summary judgment is that the court's scope of review of the administrative decision made by DASCO is limited to questions of law, and that DASCO's factual findings are not reviewable. Defendant cites 7 U.S.C. §§ 1429 and 1385 in support of its position. Section 1429 states: "Determinations made by the Secretary [of Agriculture] under this Act shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act." 7 U.S.C. § 1429 (emphasis in original). The court agrees with prior case law interpreting this provision "to limit review to the question of whether the Secretary has acted rationally and within his statutory authority." *Grav v. United States*, 14 Cl.Ct. 390, 394 (1988) (as applied to Milk Diversion Program, 7 U.S.C. § 1446(d)), *aff'd*, 886 F.2d 1305 (Fed.Cir. 1989). *See also Carruth v. United States*, 224 Ct.Cl. 422, 437, 627 F.2d 1068, 1076 (1980) (as applied to peanut price support program, 7 U.S.C. § 1421 *et seq.*); *Gibson v. United States*, 11 Cl.Ct. 6, 14 (1986) (as applied to Payment-in-Kind Program, 7 U.S.C. § 1421 *et seq.*).

Section 1385 states:

The facts constituting the basis for any ... payment under ... any loan, or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary [of Agriculture] or by the [CCC], shall be final and con-

clusive and shall not be reviewable by any other officer or agency of the Government....

7 U.S.C. § 1385. Case law interprets § 1385 to preclude judicial review of an agency's factual findings, as well as the decisions of the agency based on such factual findings, except as to questions of law, or to review allegations by plaintiff that an agency's decision is arbitrary or capricious. *See Gross v. United States*, 205 Ct.Cl. 605, 618, 505 F.2d 1271, 1279 (1974); *Gibson, supra,* 11 Cl.Ct. at 11. In *Gibson,* the court explained that "a decision is arbitrary or capricious only when it is 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Gibson, supra,* 11 Cl.Ct. at 15 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)).

In a case involving the Milk Diversion Program, which is administered under the same statute as the DTP, 7 U.S.C. § 1446, the court set forth the correct standard of review as "whether the USDA's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Parks v. United States*, 15 Cl.Ct. 183, 189 (1988) (quoting *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 238 (8th Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976)). The *Parks* court explained that this standard of review limits the court's scope of inquiry to the administrative record, and precludes *de novo* review. *Id.* at 190. Instead, the court concluded that "the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), requires a 'thorough, probing, in-depth review' of the agency action to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 190 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971)).

■ Martin has not alleged that DASCO's decision is arbitrary or capricious, and Martin does not deny DASCO's factual

finding that Martin switched some of the cows on his farm after the bid date. Therefore, the court's review of DASCO's decision will focus on its legal conclusion that Martin violated the terms of his DTP contract by switching cows.[3] As the Claims Court explained, "[w]hile the court 'is not empowered to substitute its judgment for that of the expert agency,' the agency must articulate a 'rational connection between the facts found and the choice made.'" *Parks, supra,* 15 Cl.Ct. at 190 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). The court concluded that the "agency construction need not be 'the only reasonable one, or even ... the result a court would have reached.'" Instead, "'"the judicial function is exhausted when there is found to be a rational basis for the [administrative] conclusions."'" *Parks, supra,* 15 Cl.Ct. at 190 (quoting *Nabisco, Inc. v. United States,* 220 Ct.Cl. 332, 340, 599 F.2d 415, 419 (1979) (quoting *Port Authority of St. Paul v. United States,* 193 Ct.Cl. 108, 120, 432 F.2d 455, 461 (1970))).

■ The parties' area of disagreement centers on paragraph 10(B) of the contract quoted above. Plaintiff points out that in paragraph 8, entitled "Present Dairy Herd Composition for Contract Units," the herd slated for disposition is described only as 18 cows, no heifers and no calves. Martin also points out that paragraph 9 states that he does not have any interest in dairy cattle other than those listed in paragraph 8, and paragraph 10(B) only requires Martin to dispose of the dairy cattle listed in paragraphs 8 and 9, without further description of the cattle.

Defendant's stated position is that the only reasonable interpretation of the contract is to read paragraph 10(B) as clearly requiring the disposal of all cattle on the farm "on the bid date." Defendant attacks Martin's interpretation of amended Appendix paragraphs 6(A) and 8(B), which defendant characterizes as allowing Martin the freedom to dispose of cows on his farm "on the bid date" as well as those cows on his farm "after the bid date" but which were not also present "on the bid date." Defendant disagrees with this "strained and unreasonable" interpretation, and offers its own interpretation of the amended provisions. These provisions, defendant claims, refer "to all cows that were on [Martin's] farm on the bid date as well as any that might be there after the bid date." Defendant explains that the reason for amending the language of these provisions is to provide for the inclusion of unborn calves, in the likely event that one or more calves would be born after the bid date. The court finds defendant's explanation of the amendments plausible, particularly in light of plaintiff's vague explanation, which is merely that "[t]hese revisions imply that changes in the composition of a dairy herd slated for disposition are anticipated."

Defendant also attacks Martin's reliance on Pennsylvania law to interpret the contract. The court agrees with defendant that federal law controls the interpretation of a contract to which the federal government is a party. *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943); *Forman v. United States,* 767 F.2d 875, 879–80 (Fed.Cir.1985); *Seaboard Lumber Co. v. United States,* 15 Cl.Ct. 366, 369 (1988), *aff'd,* 903 F.2d 1560 (Fed.Cir.1990); *Cegers v. United States,* 7 Cl.Ct. 615, 621 n. 10 (1985).

Next, defendant argues that Martin's interpretation of Appendix paragraphs 6(A) and 8(B) conflicts with the express language of paragraph 10(B) of the contract which, defendant argues, clearly requires disposal of all cattle on the farm "on the bid date." Defendant explains that a proper reading of Appendix paragraphs 6(A) and 8(B) produces no conflict with para-

---

**3.** The record is not clear as to the precise contract provision or provisions DASCO relied upon in upholding the COC's determination that Martin had violated the terms of his DTP contract, but the August 11, 1987 letter DASCO sent to Martin with regard to that determination cites 7

C.F.R. § 1430.457, which parallels the DTP contract's Appendix provision 6(A) in requiring that all dairy cattle located on the farm on or after the bid date be sold for slaughter or export by the end of the contract disposal period.

graph 10(B). Defendant points out that the language of paragraph 10(B) requiring disposal of all dairy cattle on the farm includes "other dairy cattle required to be disposed of by the Contract and Appendix." This language creates no conflict with the "on or after the bid date" language in Appendix paragraphs 6(A) and 8(B), explains defendant, because paragraph 10(B) clearly contemplates the possible imposition of further requirements by the terms of the Appendix, such as the disposal of cows located on the farm "after the bid date" as well as those present "on the bid date."

Finally, defendant argues that Martin's interpretation of the "on or after the bid date" language contravenes the intent of the contract, which is, to dispose of Martin's milk-producing cows and to prevent him from engaging in milk production for five years. The government points out that Martin's compensation for participation in the DTP was calculated by multiplying his bid per hundredweight times his production base, which is derived from the quantity of milk he marketed in 1984 and 1985. Based on this method of calculation, defendant draws the logical conclusion that the DTP was designed to remove from production Martin's 18 cows that were producing milk in 1984 and 1985, not any 18 cows Martin chose to surrender. Defendant argues that Martin's interpretation of the contract "would leave [Martin] and other farmers free to sell their cows for domestic market production value and purchase low production cows for disposition, but receive payments from the Government based upon the production of their original cows."

Both parties cite provisions of the contract to support their positions. The court's task in this case is to interpret the relevant contract provisions. In so doing, the court "must consider the reasonableness of the parties' proffered interpretation." *Cherry Hill Sand & Gravel Co. v. United States*, 7 Cl.Ct. 357, 361 (1985). A contract is ambiguous if it is subject to more than one reasonable interpretation. *Opalack v. United States*, 5 Cl.Ct. 349, 359 (1984). However, a dispute over the terms of a contract does not necessarily constitute ambiguity. *Dynamics Corp. of America v. United States*, 10 Cl.Ct. 275, 280 (1986). Moreover, both parties are correct in emphasizing the importance of considering the contract as a whole. As the court stated in *Municipal Leasing Corp. v. United States*, " 'an interpretation which gives a reasonable meaning to all [the clauses] will be preferred to one which leaves [one or more clauses] useless ... meaningless or superfluous; nor should any [clause] be construed as being in conflict with another unless no other reasonable interpretation is possible.' " *Municipal Leasing Corp. v. United States*, 7 Cl.Ct. 43, 46 (1984) (quoting *Mason v. United States*, 222 Ct.Cl. 436, 445, 615 F.2d 1343, 1348, *cert. denied*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980)).

The court finds that, when the contract is read as a whole, none of the disputed provisions is ambiguous. Martin's interpretation of the contract would allow him to surrender cows located on his farm "on or after the bid date." Such a reading conflicts with paragraph 10(B), which clearly and unambiguously obligates Martin to dispose of all dairy cattle present on his farm "on the bid date" by slaughter or export. Those cattle which must be disposed of are specifically identified as eighteen cows in paragraph 8 of the contract, which describes the composition of the dairy herd slated for disposition. The "on or after the bid date" language found in Appendix paragraphs 6(A) and 8(B) is not in conflict with paragraph 10(B). The court infers from a reading of the entire contract that this language serves only to take into account the birth of any calves between the bid date and the time of disposition. Indeed, when all the contract provisions are considered in light of the overall purpose of the DTP, which is to reduce national milk production, it seems clear that plaintiff's reliance on the "on or after the bid date" language to permit him to alter the identity of his herd after the bid date, other than by the birth of calves, is an unreasonable interpretation of the contract, and tends to

defeat the purpose of the contract and the DTP.[4]

Martin failed to surrender the 18 cows present on his farm "on the bid date," which constitutes a violation of the terms of the DTP contract. Having determined that the contract provisions are unambiguous and clearly prohibit Martin from switching cows located on his farm after the bid date, the court finds that defendant is entitled to prevail on its motion for summary judgment. It has been held that the construction of an unambiguous writing is an appropriate matter for summary judgment. *See Kelley v. United States,* 19 Cl.Ct. 155, 161 (1989).

Pursuant to 7 C.F.R. § 1430.459, payments under the DTP shall be made "only if it has been determined that there has been compliance with all of the terms and conditions of the regulations and the contract." *See also* Appendix paragraph 8(A) of the DTP contract. Therefore, plaintiff's argument that he should be entitled to receive compensation under the DTP because he has complied with the non-production terms of the contract is untenable. Plaintiff has clearly violated paragraph 10(B) of the contract by failing to export or slaughter the eighteen cows located on his farm on the bid date. For the foregoing reasons, the court finds no difficulty in upholding DASCO's determination that Martin violated the terms of his contract by engaging in cow-switching. As a matter of law, the court finds that DASCO's decision was rationally connected to the facts found and was supported by substantial evidence. Furthermore, DASCO's decision was not arbitrary, capricious, or an abuse of discretion. *See Gibson, supra,* 11 Cl.Ct. at 15.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is DENIED, and defendant's motion for summary judgment is GRANTED. The clerk is directed to enter judgment dismissing plaintiff's complaint and awarding defendant $1,000, plus appropriate interest, on its counterclaim. No costs.

---

**4.** The Dairy Compliance Program's milk diversion program shares the same goal of nationwide reduction of milk production with the DTP, except that the diversion program compensates farmers for reducing their herd size, and hence, their milk production, rather than ceasing milk production altogether. The legislative history of the Dairy Compliance Program indicates that Congress believed "that the success of the [diversion] program in bringing about a reduction in total milk production depends on producers taking cattle out of production, not just moving them around from one farm to another." 1983 U.S.Code Cong. & Admin.News 1658, 1675.