James DOTY and Susan Doty, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 90–491 C.

United States Claims Court.

Dec. 4, 1991.

James R. Anderson, Marshall, Minn., for plaintiffs.

Shalom Brilliant, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen and Scott E. Ray, Washington, D.C., for defendant. Terrence G. Jackson, Dept. of Agriculture, of counsel.

## OPINION AND ORDER

TURNER, Judge.

This case involves a contract for the termination of milk production entered into between plaintiff James Doty[1] and the Department of Agriculture (USDA) pursuant to the dairy termination program (DTP).[2] *See* 7 U.S.C. § 1446(d)(3)(A)(i); 7 C.F.R. §§ 1430.450—.470. Plaintiff alleges that the government breached the contract when it denied payment of amounts due under the contract and when it demanded a refund of amounts previously paid. Plaintiff also alleges that he was denied due process during administrative appeals con-

---

1. Although the complaint lists both James and Susan Doty as plaintiffs, the contract which is the subject of this action and all relevant activity involved only James Doty. Thus, this opinion refers to a single plaintiff, James Doty, as if he were the only party plaintiff.

2. USDA administers the dairy termination program, one of a series of milk price support programs, through the Commodity Credit Corporation (CCC) and the Agricultural Stabilization and Conservation Service (ASCS), both agencies within USDA. *See* 7 U.S.C. § 1446(d)(7); 15 U.S.C. §§ 714 & 714i; 16 U.S.C. § 590h(b); 7 C.F.R. § 1430.451. Program participants enter into DTP contracts with the CCC (which handles the funding of many farm subsidy programs). The ASCS is responsible for administering the operation of the DTP throughout the nation. 7 C.F.R. 1430.451. As explained in *Stegall v. United States*, 19 Cl.Ct. 765, 768–69 n. 2 (1990):

> The Secretary of Agriculture may recruit state and county ASCS committees to assist the CCC in administering federal farm subsidy

programs. 15 U.S.C. § 714i (1982). In practice, the CCC handles funding of the subsidy programs, while state and county ASCS committees are responsible for day-to-day administration.

> County ASCS committees consist of three locally elected producers. These committees oversee implementation of the subsidy programs at the local level. The committees also make determinations regarding particular producers' eligibility for subsidies.

> State ASCS committees oversee statewide operation of subsidy programs and review appeals of county committee determinations. State executive directors oversee operations at the state level, serve as advisors to the state committees, and recommend program changes to the Deputy Administrator of the ASCS in Washington, D.C.

> The Deputy Administrator promulgates regulations to supervise nationwide implementation of the farm subsidy programs. The Deputy Administrator also serves as the final arbiter in the administrative appeal process.

ducted pursuant to 7 C.F.R. Part 780.[3] He seeks damages in the amount of $116,-606.62 plus interest, which sum represents $10,000 in civil penalties assessed against him by USDA, plus $99,841.96 allegedly due under the contract, plus $6,764.66 in interest and penalties through October 17, 1989.

Defendant contends that a decision of the Deputy Administrator for State and County Operations (DASCO) of the Agricultural Stabilization and Conservation Service (ASCS) finding plaintiff ineligible to receive contract payments and liable for penalties has a rational basis in the administrative record and should be upheld. Defendant also contends that plaintiff was not denied due process and that the agency fully complied with the regulations governing administrative appeals. Defendant sets forth a counterclaim against plaintiff in the amount of $58,382.14 plus interest which represents $10,000 in civil penalties assessed against plaintiff and $48,382.14 as a refund of previous payments made under the DTP contract.

Both parties filed motions for summary judgment pursuant to RUSCC 56.[4] Upon review of the administrative record and consideration of the parties' cross-motions, we conclude that DASCO and other ASCS decision makers abused their procedural discretion in a manner which cannot be deemed harmless with respect to plaintiff and that, consequently, the final decision of ASCS must be vacated and the matter remanded for further proceedings.

I

The following statement of facts is based on the administrative record filed with the court.[5] It is intended to explain the context in which this case arose and does not represent independent findings of fact made by the court.

Plaintiff, James Doty, owned and operated a dairy farm in Marshall, Minnesota for many years. For approximately twelve years, including the time of the events giving rise to this law suit, he employed a herdsman, Lowell Siekmann, to manage the daily chores of the farm (R. 49). In February 1986, Doty inquired about the dairy termination program at the Lyon County (Minnesota) Agricultural Stabilization and Conservation Service Office. He was interested in making a bid for a contract and wanted to know whether heifers owned by Siekmann (some of which were commingled with his herd) would have to be included in the contract. Doty contends that a county official of the ASCS initially led him to believe that Siekmann's heifers could be kept out of the program in the event that Doty entered a DTP contract (R. 40). Doty submitted a bid on March 7, 1986 (R. 127), at which time he understood that all cattle on his farm on or after January 1, 1986 were required to be included in the program.

The Lyon County ASCS accepted Doty's bid on April 18, 1986 resulting in a contract to participate in the dairy termination program requiring disposal of plaintiff's herd not later than August 31, 1987 (R. 127–127J).[6] The contract listed Doty's dairy herd composition as of March 7, 1986 as 52 cows, 46 heifers and 21 calves. A form entitled "Establishment of Milk Marketing and Dairy Herd Composition" also signed by Doty on March 7, 1986 lists the dairy

---

3. The complaint also sets forth causes of action based on a Fifth Amendment taking, negligence, conversion and fraud by the defendant. Plaintiff has not pursued these issues in his summary judgment briefs, and thus we do not address them here.

4. Plaintiff filed a motion for summary judgment on January 7, 1991; the government filed a cross-motion for summary judgment on January 29, 1991.

5. The administrative record consists of one volume containing 130 pages filed with the court

on December 10, 1990. With exceptions not relevant to this case, see Esch v. Yeutter, 876 F.2d 976, 991 (D.C.Cir.1989), judicial review of agency action is limited to the record developed before the agency. References to the administrative record are indicated by "R.".

6. Doty's bid addressed two of three possible disposal periods; the bid for the disposal period of March 1, 1987 through August 31, 1987 was accepted. The practical result was that Doty could continue to operate his dairy farm until the end of the disposal period.

herd composition on January 1, 1986 as 52 cows, 24 heifers and 16 calves, however, below the bottom line of this form, these numbers were revised to read 52 cows, 46 heifers and 21 calves (R. 128). This change was made prior to execution by Doty (R. 98).

The number of Siekmann-owned heifers on Doty's farm on or after January 1, 1986, compared with the number of heifers Siekmann may have kept at other locations, is important to any decision concerning whether Doty violated DTP contract terms. Doty contends that when he went to the county ASCS office to sign the DTP contract form (i.e., to submit his bid), and learned that all of Siekmann's cattle located on his farm had to be included in the DTP contract, he informed the county ASCS employee, Josh Dirckx, that there were 46 heifers on his farm and that Siekmann owned 20 heifers. Doty contends that he did not specifically tell Dirckx that six of Siekmann's heifers were located at Siekmann's home and were not located on Doty's farm. Doty alleges that Dirckx filled out the numbers on the contract and that originally he listed 26 heifers as belonging to Doty. Doty states that this number should have been 32 but that Dirckx erroneously arrived at the number 26 by subtracting 20 (heifers owned by Siekmann) from 46 (total number of heifers) and that Dirckx increased the number of heifers to 46 when he realized that the Siekmann heifers would have to be included. Doty states that of the 46 heifers on his farm, he owned 32 and Siekmann owned 14. According to Doty, the remaining 6 heifers owned by Siekmann were located at Siekmann's home when Doty signed the contract and at all times on and after January 1, 1986 (R. 40).

Josh Dirckx, the ASCS employee who prepared the contract, stated that his understanding at the time he signed Doty into the program and made the adjustment for the 20 heifers on the contract was that all 20 of Siekmann's heifers were located at Doty's farm after January 1, 1986 (R. 100). Minutes of the Lyon County ASCS meeting held on April 19, 1989 reflect that "Mr. Doty stated that he made a mistake when he signed the original contract with the addition of Lowell's 20 heifers, because only 14 should have been included and the other 6 were never on his place with the exception of being on the truck when the other 14 were unloaded" (R. 101). Doty contends that if all 20 of Siekmann's heifers had been included in his DTP contract then the total number of heifers would have been 52 and not 46 since Doty owned 32 heifers. Doty was not required to itemize how many of the 46 heifers listed on the contract belonged to Doty and how many belonged to Siekmann. An ASCS spotchecker's report dated June 19, 1986 shows that there were found on Doty's property 50 cows, 44 heifers and 22 calves. This is close to the 52, 46, 21 count shown on the bid. (Presumably numerical discrepancies result from births, maturation of calves, accidents, etc. and may result from innocent miscounts of moving herds by the owner and the spotchecker.)

Doty certified that all dairy cattle included in his DTP contract had been destroyed by signing a form entitled "Reconciliation of Dairy Cattle Disposal Numbers" on October 30, 1987 (R. 124).[7] Meanwhile, Siekmann had left Doty's employment in December 1986.

In August 1988, the ASCS County Executive Director, Dan Hockert, was informed by an area farmer that some dairy cattle that should have been destroyed under the dairy termination program were still being milked. Hockert then contacted Siekmann since these cattle allegedly belonged to him. Siekmann informed Hockert that 15 of his cattle had been destroyed in the program and that five cattle had not been destroyed and were still being milked (R.

---

7. It may well be that so long as Doty committed no fraud in stating his milk base, and so long as all dairy cattle which contributed to the base or were on his farm at any time after January 1, 1986 were disposed of, that a mistake in herd composition numbers on the contract documents may have no adverse consequences. (If one stated on his bid more cows than he had but in fact destroyed all that he had and which constituted all that had contributed to the milk base, he would be committing no fraud on the program.)

123). Siekmann also informed Hockert that these five cattle had been moved off Doty's place in the fall of 1985. Based on this information, Hockert concluded that the five cattle did not have to be destroyed and that there was no DTP contract violation (R. 123).

Siekmann was questioned by Hockert again in January 1989. At that time, Siekmann stated that he had lied before and now wanted to tell the truth. Siekmann told Hockert that after he purchased the 20 heifers he took them to Doty's farm and later took five heifers home with him in early November 1985. Siekmann then stated that he took these five heifers back to Doty's farm and that he also had one cow at Doty's farm. Siekmann then stated that all 21 cattle remained on Doty's place until the summer of 1986 when he took six of them back to his own place. These six cattle were then moved to Lawrence St. Aubin's farm where they were being milked. The other 15 cattle were slaughtered or died accidentally. During this meeting with Hockert, Siekmann also stated that one big heifer had been given to John Christianson in the fall of 1986. He also stated that two of the cattle at St. Aubin's farm were branded but that the brands had grown over and were difficult to see (R. 122). Hockert indicated in his notes from this meeting that he had talked with Doty about this matter prior to the second conversation with Siekmann and that Doty had stated that all cows included in the contract had been destroyed. Doty also had informed Hockert that Siekmann's one cow and five heifers were not at his place after January 1, 1986 (R. 122).

After receiving the new information from Siekmann, Hockert referred the matter to Donald Friedrich, the ASCS State Executive Director. The state ASCS office then referred it to the Regional Inspector General of the Department of Agriculture for possible investigation. The Regional Inspector General declined to investigate the case based on the fact that Doty "probably destroyed most of his herd" (R. 119).

Hockert (ASCS County Executive Director) then wrote to Doty notifying him of an apparent violation of his DTP contract by "incorrectly reporting dairy cattle numbers on your unit as of the bid date" and informing Doty that he could request a review of the circumstances surrounding the violation (R. 117). At this time, Hockert also contacted John Christianson (who had been implicated for a possible violation by Siekmann's second story) to inquire whether he had acquired any dairy cattle from a farm participating in the dairy termination program as of January 1, 1986 [8] (R. 116). Christianson responded by letter that he had received a cow from a DTP contract farm *before* January 1, 1986 (R. 112). This exchange refuted Siekmann's second story that Doty had given Christianson one heifer in 1986. The record does not indicate that any further administrative action was taken with respect to Christianson.

Doty was represented by an attorney who had requested copies of the Lyon County ASCS file in order to determine the allegations against Doty in preparation for a hearing before the county committee. The county office provided a copy of the file but, in reliance on the Freedom of Information Act, excluded copies of all inter-agency memoranda, documents or reports containing recommendations, opinions or advice that the agency uses in its decision-making process. On the same basis, the county office also excluded any information about other individuals or their farming operations that could be considered derogatory to them (R. 109). Doty did not appeal from this decision under the Freedom of Information Act. On March 27, 1989, Hockert informed Doty's attorney: "A brief summary of the possible violation is that our office was informed that Mr. Doty did not slaughter all of the dairy cattle that were supposed to be slaughtered as a result of his participation in the Dairy Termination Program" (R. 106). Previously, Hockert had notified

---

**8.** This date is significant because regulations require that DTP participants include in their contracts all cattle located on the producer's farm on or after January 1, 1986. *See* 7 C.F.R. § 1430.457(a).

Doty of a different ground for violation of the contract, i.e., incorrectly reporting the number of dairy cattle on the unit as of the bid date (R. 117).

The Lyon County ASCS committee conducted a meeting with Doty and his attorney on April 19, 1989 to provide an opportunity to explain how the apparent contract violation may have occurred. At the meeting, Doty stated that the two branded cattle found on Lawrence St. Aubin's farm had been taken from his farm without his knowledge. He presented to the committee a written statement from Lawrence St. Aubin that Siekmann had told St. Aubin that the branded cattle were taken from Doty's farm without Doty's knowledge (R. 87, 101–103). Doty also stated that he could not explain how the two branded cattle got to Siekmann's place and that he understood at the time of sign-up that only the 14 heifers and one cow belonging to Siekmann had to be slaughtered under the terms of the contract (R. 101). The Lyon County ASCS Committee meeting minutes indicate that it reviewed the following facts:

—Jim [Doty] indicated 20 heifers on the contract and now states only 14 were ever on his place.

—It was the program assistants [Dirckx] understanding at the time of sign-up that all 20 heifers were on Jim's [Doty's] place after 1–1–86.

. . . .

—County Office personnel viewed 5 cows on Lawrence St. Aubin's farm. 2 of the 5 have brands. Lawrence provided a sale receipt to account for the 6th cow.

—The 6 cows were determined to have been on Jim's [Doty's] place because of the 20 count on the contract, and Lowell's [Siekmann's] second statement which concurs with the program assistants understanding of the 20 head.

—On a positive side, Jim destroyed 14 of the cattle and the Committee believes he did destroy all the cattle in his own herd.

Based on these facts, the county committee determined that Doty had acted in good faith because: (1) Siekmann was involved and the cattle in question belonged to him and (2) Doty was not involved in the day-to-day management of the dairy herd, and nothing indicated he was scheming or devising to circumvent the program (R. 102). The county committee determined that, at the very least, Doty should be penalized for the two branded cows and recommended that he be penalized for all six because of the numbers on the contract and because of Siekmann's second statement indicating that all 6 should have been destroyed (R. 102).

By letter dated April 24, 1989, the county committee requested that the state ASCS committee review the Doty file including the county committee meeting minutes and asked for their recommendation and/or determination on the matter (R. 97). The state committee responded by letter dated June 22, 1989. The State ASCS Executive Director, Friedrich, indicated that he had contacted the Washington Livestock Section to discuss the Doty case. He then told the county committee how to resolve the case based on instructions given from the Washington office (R. 94). Friedrich wrote:

1. Doty should be assessed a $5,000.00 per head penalty for each of the 6 cows in question. Procedure also allows that he refund all DTP program benefits earned to date, plus interest. If the County Committee makes a determination of a penalty less than this, their recommendation must be submitted to the State Office and Washington for approval.

2. The owner of the 6 cows [Siekmann] is also in violation of the contract, even though it is not his contract. He is also subject to a $5000.00 per head penalty.

R. 94.

The county committee met with Doty again on June 21, 1989 to hear his appeal of their initial determination. No minutes of this meeting are in the administrative record. County Executive Director, Jeffrey Holcomb, indicated afterwards in a letter to the state ASCS office that Doty acknowledged at the hearing that he was

responsible for the two branded cattle. Holcomb also wrote that the county committee recommended that Doty remain eligible for all DTP payments but that he be penalized $30,000 ($5000 × six head) for dairy cattle not destroyed. Holcomb indicated that Doty was informed in writing of the county committee's recommendation to the state committee and of his appeal rights to the state committee (R. 93). Doty appealed the county committee's recommendation to the state ASCS committee.

On August 16, 1989, the county committee met with Siekmann and his attorney at which time Siekmann gave them a written statement explaining his working relationship with Doty and his involvement in Doty's dairy operation. Based on Siekmann's statement, the county committee recommended that no penalty be assessed against him (R. 90).[9] Also based on the written Siekmann statement, the county committee changed its decision that Doty had acted in good faith in trying to comply with his DTP contract. They then determined that he was in full violation of the contract and recommended to the state committee that he be ineligible to receive any DTP payments. This determination was based on a conclusion that Doty was involved in the switching of dairy cattle and incorrectly reporting his dairy herd size (R. 88). Doty was informed only that "additional information" had been "made available" to the county committee; he was not provided with a copy of the Siekmann statement nor was he given an opportunity to rebut its contents (R. 83). Based on the earlier Freedom of Information Act denial, Doty still had not been provided with the entire ASCS file (R. 78), and he was unclear as to the precise allegations against him (R. 75).

The hearing before the Minnesota state ASCS committee was scheduled for September 21, 1989. On September 12, 1989, Doty's attorney received copies of 61 pages from the ASCS file including the minutes of the Lyon County committee meeting and the written Siekmann statement. Doty's attorney requested that Siekmann and the ASCS spotchecker, Steven Gniffke, be present at the state committee hearing to testify. At the time of the hearing, Doty's attorney gave the state committee an affidavit of John Christianson, dated September 20, 1989, which refuted inaccuracies in the Siekmann statement (R. 65). Siekmann had claimed that Christianson helped with the branding of cattle on Doty's farm and that Siekmann, Doty and Christianson branded all but seven or eight of Siekmann's heifers and all but two of Doty's heifers (R. 67). Siekmann had also claimed that Christianson took one heifer home with him after the branding. In his affidavit, Christianson swears that he never helped Doty with any branding and Siekmann's statement to the contrary is absolutely and completely false (R. 65). Previously, Christianson had responded to an inquiry from the county ASCS office by indicating that he did not receive any cattle from a DTP contract farm after January 1, 1986 (R. 112). This also refutes Siekmann's written statement.

In addition, Doty's attorney presented to the state committee a statement from James St. Aubin explaining that he (not Christianson) helped Doty and Siekmann brand the cattle before selling them in accordance with program requirements. St. Aubin stated that to the best of his knowledge, all heifers and cows located at Doty's farm were branded (R. 85–86). This corresponds with the results of a spotcheck conducted by ASCS employee Steven Gniffke on June 19, 1986 which verified that all cattle on Doty's farm were branded at that time except for two calves (R. 9). There were thus four disinterested sources of evidence (James St. Aubin, Lawrence St. Aubin, Christianson and Gniffke) before the state committee which refuted the accuracy of Siekmann's written statement and which

---

9. The State ASCS Executive Director, Friedrich, later rejected this recommendation and imposed a $10,000 penalty against Seikmann for possession of the two branded cattle (R. 64). After an appeal by Seikmann, the state committee granted partial relief by reducing the penalty to $1,000 ($500 per head for the two branded cattle) on the ground that Seikmann had no potential gain from any program payments (R. 4).

supported Doty's position and Siekmann's first (oral) statement.

Siekmann's written statement in the administrative record is not in the form of an affidavit nor is it signed or dated. It contradicts the original story given by Siekmann to Hockert upon which Hockert determined that there was no contract violation. The statement coincides with the second story given by Siekmann to Hockert and goes into further detail. It says that Doty gave Siekmann permission to take five heifers back to Siekmann's farm and that Doty helped load them onto a truck. The statement also contains an acknowledgment by Siekmann that he lied to Lawrence St. Aubin about whether the heifers were branded for the DTP. St. Aubin allowed Siekmann to board the five heifers on his farm provided that they had not been previously included on Doty's DTP contract. Siekmann told St. Aubin that these heifers were not at Doty's place when Doty entered the program which is consistent with his original story and with Doty's consistent position (R. 53). According to Siekmann's statement, two of the cattle were branded for disposal under the program but the brands had grown over and Siekmann thought that St. Aubin would not notice. Siekmann also stated that he took another branded heifer from Doty's farm to St. Aubin's farm in the summer of 1987 with Doty's permission and that Doty helped him load it. Siekmann stated that he originally lied to County Executive Director Hockert about his involvement because he wanted to protect Doty and he thought Doty would compensate him for his cattle and that Doty had signed Siekmann's cattle into the program without Siekmann's knowledge or consent (R. 49–54).

The administrative record does not contain minutes from the state ASCS committee hearing of Doty's appeal or any other information showing what took place, who was present or who testified. Government counsel in this matter has informed the court that a court reporter was present at the state committee hearing but no transcript was ever produced. The State ASCS Executive Director, Friedrich, denied

Doty's appeal by letter dated October 11, 1989 (R. 62). This letter, which constitutes the state committee's decision, contains no statement or findings of fact nor does it set forth any reasoning or basis for the determination. *But see* 7 C.F.R. § 780.8(d) ("The reviewing authority shall have prepared a written record containing a clear, concise statement of the facts as asserted by the participant and material facts found by the reviewing authority. The names of interested persons appearing at the hearing shall be included."). The October 11, 1989 letter states (R. 62):

> Based on review of their information and available records, the Minnesota State ASCS Committee has agreed with the Lyon County Committee that James Doty is in violation of his Dairy Termination Program contract. The State Committee agreed all the applicable penalties be assessed, including a civil penalty of $10,000 for not timely and properly disposing of the two branded dairy cattle in question. The other applicable penalties include, refund of previous DTP payments plus interest, no future earning of DTP payments, and possible marketing penalty if Mr. Doty is determined to have an interest in dairy cattle or marketing milk during the nonproduction period.

The state committee decision actually increased the penalty since the county committee, while deciding that Doty was ineligible to receive contract payments, had waived the $5000–per–head penalty on cattle in Siekmann's possession (R. 88). Doty appealed the state committee decision to the Deputy Administrator for State and County Operations (DASCO) in Washington, D.C. (R. 34–46).

Prior to his hearing before DASCO, Doty's attorney submitted several documents including a fact statement signed by Doty which pointed out unexplained inconsistencies in Siekmann's second version of events (R. 34–46). For example, if the five heifers found at Lawrence St. Aubin's farm had been on Doty's farm until the summer of 1986 as Siekmann contends, then they would all have been branded, but only two of them were branded. Siekmann

explains this by saying that not all the cattle at Doty's farm were branded but that some remained unbranded and some were sold for slaughter unbranded (R. 44). Nothing in the record corroborates this statement. The statement of the person who did the branding, James St. Aubin, and the ASCS spotcheck, both suggest that all cattle were branded. If there had been unbranded cattle at Doty's farm then (unless they were hidden) the surprise spotcheck should have discovered them.

Plaintiff submitted a statement of Lawrence St. Aubin in which he said that when he asked Siekmann how Doty allowed the two branded cattle to be moved off his farm, Siekmann responded that Doty didn't know anything about it (R. 87). This contradicts Siekmann's written statement that Doty gave him permission to take cattle from Doty's property and that Doty helped load them on a truck.

Following a hearing [10] on December 5, 1990 in which Doty appeared by telephone, DASCO denied the appeal by letter dated May 16, 1990 (R. 1–3). DASCO based his decision on two regulations:

> Program regulations at 7 CFR § 1430.-461 state in part if the Commodity Credit Corporation (CCC) determines that any participating producer has erroneously represented any fact ... which has the effect ... to defeat the purpose of the contract, no person shall be eligible for payments under the contract and all payments previously made to any person under the contract shall be refunded to CCC. Further, program regulations at 7 CFR § 1430.460 state in part that in addition to any other amount due CCC, each person who makes a false statement as to the number of dairy cattle that were sold for slaughter or export under a contract shall be subject to a civil penalty of not more than $5,000 for each head of cattle to which such statement applied. Therefore, it is our finding that the

Minnesota State Committee acted properly within its delegated authority and we have determined to deny your client's appeal.

R. 2.

This was the first time Doty was apprised of the legal basis for the agency's actions at the county, state or national level. Doty appealed DASCO's decision by filing the complaint in this action on June 7, 1990.

## II

### A. *Jurisdiction*

■ The Claims Court's jurisdiction over plaintiff's complaint is based on the Tucker Act, 28 U.S.C. § 1491(a), and the Commodity Credit Corporation (CCC) Charter Act, 15 U.S.C. § 714b(c). Plaintiff's claim fulfills Tucker Act requirements because it is for money damages and is founded on an Act of Congress (7 U.S.C. § 1446), executive department regulations (7 C.F.R. §§ 1430.450–.470) and an express contract, *but see Esch v. Yeutter*, 876 F.2d 976, 978 n. 13 (D.C.Cir.1989). The CCC Charter Act provides for Claims Court jurisdiction over "[a]ny suit by or against the United States as the real party in interest based upon any claim by or against the Corporation" when the suit is "of the type enumerated in section 1491 of title 28." 15 U.S.C. § 714b(c).

The Claims Court's jurisdiction over defendant's counterclaim is based on 28 U.S.C. § 1503: "The United States Claims Court shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court." *See Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835 (1946); *Brown v. United States*, 207 Ct.Cl. 768, 784–87, 524 F.2d 693, 703–04 (1975); *Martin v. United States*, 20 Cl.Ct. 738, 741 n. 2 (1990); *Parks v. United States*, 15 Cl.Ct. 183, 189 (1988).

---

10. Prior to the hearing, Doty was informed that official transcripts are not generally made but that one could be made at Doty's expense. Doty was instructed to contact DASCO if he desired a transcript and they would make the arrangements (Rec. 24). By letter dated October 30, 1989, Doty's attorney requested that DASCO make arrangements for a transcript of the hearing (Rec. 22). The administrative record does not contain such a transcript and government counsel has indicated to the court that none exists.

B. *Scope and Standard of Review*

■ A threshold issue, resolution of which dictates the standard of review, involves the nature of the suit. Plaintiff asserts a cause of action based on breach of an express contract. Ordinarily, when this court considers a breach of contract claim, it conducts proceedings to determine de novo the facts and circumstances to which the relevant law must be applied. *See Northbridge Elecs., Inc. v. United States*, 195 Ct.Cl. 453, 457–58, 444 F.2d 1124, 1127 (1971). In such proceedings, the parties would be entitled to conduct discovery to obtain information necessary to the presentation of their case.[11]

Defendant contends, in essence, that this is not a de novo contract case but rather a review of an administrative decision made by DASCO, an agency official within the Department of Agriculture. The standard employed when this court reviews administrative action differs from the standard employed in a de novo review. Defendant contends that the court's review is limited to determining whether DASCO's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law based on the administrative record. According to defendant, the parties are not entitled to conduct discovery since the scope of the court's review is limited to the record developed by the agency.

The DTP contract document appears to satisfy all of the traditional requirements for an enforceable contract, *i.e.*, offer, acceptance and consideration passing between the parties. *See Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982). The form signed by both parties is entitled "Contract To Participate In The Dairy Termination Program." On its face, the form states that the "information requested is necessary for CCC to consider and process *the offer* to enter into a Dairy Termination Program contract...." (R. 127) (emphasis added). It also states that failure to furnish the necessary information "will result in *rejection of the offer* to enter into the contract." *Id.* (emphasis added). The contract document also states that "[p]rior to the execution of this form ... by the County Committee, *such form shall be considered an offer by the producer to enter into a contract* to participate in the Dairy Termination Program." *Id.* (emphasis added). Under the terms of the contract document, all dairy cattle required to be disposed of by the contract shall "be sold for slaughter or export by the end of the disposal period for which the bid is *accepted.*" *Id.* (emphasis added). With regard to consideration, the plaintiff agreed to slaughter or sell for export his entire dairy herd in exchange for payment of $99,841.96 by the government. The government agreed to compensate the producer if all conditions for payment were met (which would contribute to the accomplishment of the CCC objective of reducing the surplus of milk produced in the United States).

Despite the foregoing, the Claims Court has not viewed cases arising under DTP contracts (or contracts under similar agricultural subsidy programs) as de novo proceedings for enforcement of contract rights but rather as appeals of administrative action subject to judicial review and controlled by a corresponding standard of review. *See, e.g., Parks v. United States*, 15 Cl.Ct. 183 (1988). The court has traditionally limited its review in such cases to the administrative record.[12] *Id.* The Federal

11. In this case, plaintiffs' requests for discovery were denied and defendant's motion for a protective order was granted, *pro tempore*, on February 26, 1991.

12. There are circumstances under which it is appropriate for a trial court to supplement an administrative record, particularly when a challenge is made to the procedural validity of agency action. In *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989), the court found that "exceptions to the general rule have been recognized" under the following circumstances:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take

Circuit has never directly resolved the issue of whether breach of contract claims under farm subsidy programs such as the DTP are ever entitled to de novo review. It has, however, upheld Claims Court review of administrative action by the Secretary of Agriculture in such farm subsidy programs under the arbitrary, capricious, abuse of discretion standard. *See, e.g., Frank's Livestock & Poultry Farm, Inc. v. United States,* 905 F.2d 1515 (Fed.Cir. 1990).

Furthermore, in a case involving federal education grants to states, the Supreme Court stated:

> Although we agree with the State that Title I grant agreements had a contractual aspect, ... the program cannot be viewed in the same manner as a bilateral contract governing a discrete transaction.... Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.

*Bennett v. Kentucky Dep't of Educ.,* 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985). The DTP contract in this case may resemble a "bilateral contract governing a discrete transaction" more than the grant agreements in *Bennett,* yet, unlike traditional contracts, it remains governed by specific statutory and regulatory provisions.

In the present case, plaintiff's contract to participate in the dairy termination program contains an appendix which reproduces the governing regulations nearly verbatim (R. 127A–127H) and states that the regulations governing the program, 7 C.F.R. Part 1430, are incorporated by refer-

ence as a part of the parties' agreement. (Appendix par. 15, R. 127H). While the regulations do not expressly limit the parties' right of judicial review, they do set forth rules and procedure that must be followed by a person who seeks reconsideration or review of an ASCS determination with respect to compliance with program requirements and the making of payments or other program benefits to a person who is a participant in the program. 7 C.F.R. § 1430.466; 7 C.F.R. Part 780. By signing the contract, Doty agreed to these terms.

Additionally, Congress has provided that, "[t]he facts constituting the basis for ... any loan, or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government." 7 U.S.C. § 1385. Congress has also provided that, "Determinations made by the Secretary under [the Agricultural Act of 1949] shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act [15 U.S.C. § 714 *et seq.*]." 7 U.S.C. § 1429. The Federal Circuit and the Court of Claims have interpreted these statutory provisions to mean that the Secretary's factual determinations are final but that his legal conclusions are subject to limited judicial review to ensure that the Secretary acted rationally, within his statutory authority, and according to procedure required by law. *See Frank's Livestock & Poultry Farm, Inc. v. United States,* 905 F.2d 1515 (Fed.Cir.1990); *Carruth v. United States,* 224 Ct.Cl. 422, 627 F.2d 1068

---

action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

The court concluded in that case, *Esch,* 876 F.2d at 993: "Only by examining the underlying facts, which [the agency] never gathered in a coherent record, could the [trial] court determine whether appellees got their procedural just due."

The Court of Appeals for the District of Columbia also permitted supplementation of the

administrative record by the trial court in *Natural Resources Defense Council, Inc. v. Train,* 519 F.2d 287 (D.C.Cir.1975) (litigants challenging an agency decision presented affidavit making a substantial showing that the agency had not filed the entire administrative record with the court).

None of these exceptions applies in the instant case, and our review is confined to the administrative record.

(1980); *Gross v. United States*, 205 Ct.Cl. 605, 505 F.2d 1271 (1974).

We conclude that when plaintiff entered into the DTP contract, he agreed to be bound by the statutory and regulatory framework governing the dairy termination program which effectively limited the availability of de novo judicial review over a claim for breach of contract.[13] Accordingly, we hold that the plaintiff is not entitled to de novo review in this case but that DASCO's determination should be reviewed under the standards articulated in the Administrative Procedure Act, 5 U.S.C. § 706.[14]

The APA articulates standards for a court to follow when reviewing administrative action:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> . . . .
>
> (D) *without observance of procedure required by law;*

**13.** We do not hold that a DTP participant is never entitled to de novo review of a claim for breach of contract. If a DTP participant alleged that he had fulfilled all the terms of his contract but that the government did not pay him or take any administrative action against him, there would be no agency action to review; such a DTP participant might have a viable breach of contract claim. *See generally County of Suffolk v. United States*, 19 Cl.Ct. 295 (1990).

**14.** Agency action is not reviewable when "statutes preclude judicial review" or when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Furthermore, agency action is not reviewable in the Claims Court unless the plaintiff can meet the specialized jurisdictional requirements set forth in the Tucker Act, 28 U.S.C. § 1491(a)(1) by alleging that it has a substantive right enforceable

> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute . . .

5 U.S.C. § 706 (emphasis added).

The APA requires a "thorough, probing, in-depth review" of the agency action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). The court is not empowered to substitute its judgment for that of the agency and the agency construction need not be the only reasonable one or the one that the reviewing court would have reached. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962). Rather, " 'the judicial function is exhausted when there is found to be a rational basis for the [administrative] conclusions.' " *Nabisco, Inc. v. United States*, 220 Ct.Cl. 332, 340, 599 F.2d 415, 419 (1979) (quoting *Port Auth. of St. Paul v. United States*, 193 Ct.Cl. 108, 120, 432 F.2d 455, 461 (1970)).

DASCO's decision that plaintiff was not entitled to DTP contract payments and was liable for penalties is entitled to substantial deference. *Rogers v. United States*, 14 Cl.Ct. 39, 46 (1987), *aff'd*, 861 F.2d 729 (Fed.Cir.1988), *cert. denied* 490 U.S. 1034, 109 S.Ct. 1930, 104 L.Ed.2d 403 (1989). Indeed, the court must presume that DASCO

against the United States for money due. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976).

Agency action is reviewable in the Claims Court when Tucker Act jurisdiction exists and when some money-mandating provision is the basis of a claim for monetary relief from the United States. In such cases, the portions of the APA, controlling scope and standard of judicial review of agency action, 5 U.S.C. §§ 701, 706, apply in the Claims Court. *See Stegall v. United States*, 19 Cl.Ct. 765, 769–70 (1990); *Parks v. United States*, 15 Cl.Ct. 183, 189–90 (1988). DTP contract claims like the one in this case constitute appeals from final agency action subject to judicial review. Thus, we turn to the APA, 5 U.S.C. § 706, for standards to guide review of the agency action in question.

acted correctly and with regularity. *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. The court's review includes an inquiry into both the rationality of the decision and an inquiry into the procedural context to see if there was procedural error. *Id.* at 417, 91 S.Ct. at 824. Assertions by the plaintiff of procedural error at the agency level are reviewed under the harmless error standard. *Sterlingwear of Boston, Inc. v. United States*, 11 Cl.Ct. 879, 889 (1987). Thus, the agency action in question need only be in substantial compliance with applicable regulations, and a litigant must show demonstrable prejudice in support of its claim of procedural error. *Laningham v. United States*, 2 Cl.Ct. 535, 556 (1983).

## III

### A. *Due Process Allegation*

Plaintiff relies on both the APA, 5 U.S.C. §§ 554, 556, 557, and the applicable appeal regulations, 7 C.F.R. Part 780, to support his position that he was denied due process during the administrative proceedings. Defendant contends that the formal adjudicatory procedures contained in 5 U.S.C. §§ 554, 556, and 557 do not apply to dairy termination program hearings and that the agency fully complied with the appropriate procedure outlined in the regulations, 7 C.F.R. Part 780. We conclude that sections 554, 556 and 557 do not apply to dairy termination program hearings. We further conclude that DASCO committed no violation of plaintiff's constitutional due process rights. We find, however, that DASCO failed to follow some of the procedures set forth in 7 C.F.R. Part 780 and, in one critical respect, abused the procedural discretion granted to it by these regulations.

### B. *Rights to Formal Adjudication*

█ Doty contends that he was denied APA procedural protections such as the right to cross-examine witnesses, the right to an impartial decision-maker, and the right to be advised of contacts made by the agency with opposing parties. *See* 5 U.S.C. §§ 554, 556, 557. These formal adjudicatory provisions of the APA apply "in every case of adjudication required by statute to be determined on the record after opportu-

nity for an agency hearing." 5 U.S.C. § 554(a). Defendant maintains that these provisions do not apply to hearings conducted pursuant to the dairy termination program because DTP hearings are informal and are not adjudications required by statute to be "on the record."

We find that dairy termination program hearings are required by statute if requested by a participant but further find that such hearings are not among those defined in 5 U.S.C. § 554(a) and consequently are not subject to the formal procedural requirements of 5 U.S.C. §§ 556 & 557. The statute establishing the dairy termination program expressly provides for notice and an opportunity for a hearing before any penalty shall be assessed by the Secretary of Agriculture. 7 U.S.C. § 1446(d)(5)(B)(i). It states: "Any penalty provided for under this subparagraph shall be assessed by the Secretary after notice and opportunity for a hearing." *Id.* The regulations promulgated under 7 U.S.C. § 1446(d) provide that penalties may be assessed after notice and opportunity for an *informal* administrative hearing. 7 C.F.R. § 1430.460(b).

The words "on the record" are absent from the statute requiring a DTP hearing, yet this alone would not preclude application of § 554. Although some cases applying § 554 to different types of agency action require that the relevant statute contain the phrase "on the record" in order for § 554 to apply, the weight of authority is to the contrary. *Compare Steadman v. SEC*, 450 U.S. 91, 96–97 n. 13, 101 S.Ct. 999, 1005 n. 13, 67 L.Ed.2d 69 (1981) (absence of the phrase "on the record" from a statute requiring an agency hearing does not remove the proceeding from the procedural requirements imposed by 5 U.S.C. § 554) *with Railroad Comm'n of Texas v. United States*, 765 F.2d 221, 227–28 (D.C.Cir.1985) (because operative statute did not require a hearing "on the record", § 554 does not apply). The prevailing view seems to be that the statute requiring the agency hearing need not contain the phrase "on the record" in order for § 554 to apply. *See also Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616,

*modified* 339 U.S. 908, 70 S.Ct. 564, 94 L.Ed. 1336 (1950) (words "required by statute" and not the phrase "on the record" determines whether agency proceeding falls with the ambit of § 554); *City of West Chicago v. United States Nuclear Regulatory Comm'n,* 701 F.2d 632, 641 (7th Cir. 1983) ("[a]lthough Section 554 specifies that the governing statute must satisfy the 'on the record' requirement, those three magic words need not appear for a court to determine that formal hearings are required"); *Cf.* Attorney General's Manual on the Administrative Procedure Act, 42–43 (1947).

We consider the absence of the phrase "on the record" from 7 U.S.C. § 1446(d)(5)(B)(i) as one factor among several leading to our conclusion that Congress did not intend for the procedural protections of the APA to apply to DTP hearings. The regulation governing the procedure for appeals by DTP participants, 7 C.F.R. Part 780, has been in existence for many years and applies to many other programs within the Department of Agriculture in addition to the dairy termination program. No court to this date has held that the APA imposes greater procedural requirements on the conduct of DTP administrative proceedings than those provided by 7 C.F.R. Part 780. Indeed, the Supreme Court has warned against disrupting well-established agency procedures for resolving disputes by imposing stricter procedural requirements based on the general provisions of the APA. *See Withrow v. Larkin,* 421 U.S. 35, 49–50, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) ("the challenge to this combination of [executive and judicial] functions [a perceived technical due process violation] 'assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity.' ") (quoting *Richardson v. Perales,* 402 U.S. 389, 410, 91 S.Ct. 1420, 1431–32, 28 L.Ed.2d 842 (1971)). *Cf. National Corn Growers Ass'n v. Baker,* 840 F.2d 1547, 1558 (Fed.Cir.1988).

While the argument in favor of applying § 554 to DTP hearings has strong appeal to those familiar with formal trial-type proceedings and who appreciate the seriousness of the economic and reputational consequences of ASCS decisions made after extremely informal evidence gathering, we conclude that Congress did not intend to require formal, trial-type procedures in conjunction with these administrative proceedings and that 7 C.F.R. Part 780 controls the informal hearings available to DTP participants. Consequently, plaintiff's assertion that he was not accorded APA procedural protections set out in 5 U.S.C. §§ 554(a), 556 & 557, although accurate, is to no avail.

### C. *Constitutional Allegation*

We now turn to Doty's contention that he was denied constitutional due process rights during the ASCS administrative proceedings. Doty claims that (1) he was denied any right to cross-examine witnesses testifying against him; (2) he did not receive an impartial hearing because persons prosecuting the case also functioned as decision-makers and (3) all contacts made by the ASCS with all witnesses were *ex parte.*

■ With regard to the claim that the commingling of investigatory and adjudicatory functions on behalf of persons within the agency deprived Doty of a fair hearing, the Supreme Court has held that such commingling does not rise to the level of a deprivation of constitutional due process without a showing of actual bias against the individual resulting from the commingling. *Withrow v. Larkin,* 421 U.S. 35, 52, 95 S.Ct. 1456, 1467 (1975). The Court recognized the problem with commingled functions in the following fashion:

> That is not to say that there is nothing to the argument that those who have investigated should not then adjudicate. The issue is substantial, it is not new, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons. No single answer has been reached. Indeed, the growth, variety, and complexity of the administrative processes have made any one solution highly unlikely. Within the Federal

Government itself, Congress has addressed the issue in several different ways, providing for varying degrees of separation from complete separation of functions to virtually none at all.

*Id.* at 51–52, 95 S.Ct. at 1466–67.

■ In order to make out a due process violation of 5 U.S.C. § 554(d), an individual must demonstrate that the commingling of administrative functions resulted in actual bias. It is not enough merely to allege that the same members of an administrative agency investigated facts, instituted proceedings and then made the necessary adjudications. *Id.* at 54, 95 S.Ct. at 1468. In this case, Doty alleges that the county executive director, Hockert, served as both investigator and decision-maker at the county level hearing and that this deprived him of a fair hearing. The basic due process requirement of a fair trial in a fair tribunal applies to administrative agencies which adjudicate as well as to courts. *Id.* at 46, 95 S.Ct. at 1464. Absent a showing of actual bias, however, the mere fact that Hockert served in both capacities is not *per se* a violation of constitutional due process. *Id.*

Doty also contends that he was denied constitutionally guaranteed due process because he was not permitted to cross-examine witnesses testifying against him before the ASCS and because all contacts made by the ASCS with those witnesses were *ex parte*. We are not persuaded that these allegations rise to the level of due process violations. In any event, as a general rule, a court should avoid addressing a constitutional issue if there exists some other means of resolving the dispute. Here, we find that Doty's complaints can be adequately addressed under 7 C.F.R. Part 780 without finding a violation of constitutional due process.

### D. *Regulatory Allegations*

Doty's DTP contract provides that the regulations governing the dairy termination program, 7 C.F.R. Part 1430, are incorporated by reference as a part of the parties' agreement (R. 127H, paragraph 15). One of those regulations, 7 C.F.R. § 1430.466, states that reconsideration and review of ASCS determinations shall be conducted in accordance with the Administrative Appeal Regulations, 7 C.F.R. Part 780. The appeal regulations apply to many different programs administered by the ASCS including the dairy termination program. They prescribe rules and procedures which must be followed by any person seeking reconsideration or review of an ASCS determination made with respect to "[c]ompliance with program requirements" and the "making of payments or other program benefits to a person who is a participant in such a program." 7 C.F.R. § 780.1. Plainly, these regulations govern Doty's appeal from adverse ASCS determinations.

■ The regulations set forth a three-tier review process whereby a participant may obtain reconsideration of an ASCS determination and an "informal" hearing before a county committee, a state committee and the deputy administrator for state and county operations. 7 C.F.R. § 780.3. After an initial appeal determination is made by the county committee, a participant who believes it was improper may obtain review of the county determination by the state committee. If a participant believes that a state committee determination is improper, he may obtain review of it by DASCO. The regulations require that an informal hearing be conducted at each level of review. The reviewing authority [15] may then affirm, modify, or reverse any determination made by it initially or made by a lower reviewing authority, or may remand the matter to a lower reviewing authority for further consideration as deemed appropriate. 7 C.F.R. § 780.9.

As illustrated in the recitation of facts, the administrative context of this case is *not* one in which a decision of the county executive director was appealed to the county committee which made an independent determination which, in turn, was appealed to the state committee which made

---

**15.** "Reviewing authority" is defined as the county committee, state committee or the Deputy Administrator, as appropriate. 7 C.F.R. § 780.2.

an independent determination which, in turn, was appealed to DASCO for a fresh independent determination. In this case, after Dan Hockert's decision adverse to Doty (R. 117), the county committee asked the state committee for guidance in reaching a decision (R. 103 ("[a]t this time the Lyon County ASCS Committee is requesting State ASCS Committee's recommendation [and/or] determination on this matter"), 96, 94 (relay by state to county office of DASCO instructions on violations and fines), 93) and DASCO virtually dictated the rulings to be made by the county and state committees, R. 94–95. Further, there is no single trial-type event in the DTP adjudication process; rather letters, telephone calls and memoranda trickle in at various levels and ASCS employees interview various people at various locations all of which, in combination, constitutes the informal administrative evidence-gathering process. In this case, evidence gathering continued throughout the entire process, including the hearing before DASCO (e.g., R. 49–56, 65–66, 78, 85, 87, 90).

However, the appeal regulations and DTP regulations contemplate these possibilities and accommodate the process. For example, 7 C.F.R. § 780.3 contemplates participant appeals from decisions "initially" made by a state committee or by DASCO as well as from those "initially" made at the county level. Further, 7 C.F.R. § 780.9 provides that each level of review, including DASCO, "may request the ... participant to produce additional evidence which it may deem relevant or may develop additional evidence from other sources." Further, the DTP regulations, 7 C.F.R. § 1430.451(d), explicitly provide: "No delegation herein to a State or county committee shall preclude the Administrator, ASCS, or a designee, from determining any question arising under the [DTP] program...."

Consequently, we find nothing unlawful or violative of Doty's procedural rights merely from the early intervention of DASCO in the decision-making process, given that Doty had the right, which he pursued, to seek a final agency review and decision by DASCO, in the course of which Doty was able to submit additional evidence not considered by the original decision-maker (the Lyon County ASCS Executive Director) or by the county or state committees. As a matter of process, before DASCO rendered its decision (R. 1–3) which became the final agency action, it had available to it all evidence which had been received and which is now in the record.

■ The nature of the informal hearing provided to DTP participants is described in 7 C.F.R. § 780.8 which states that the hearing "shall be conducted by the reviewing authority, ... in the manner deemed most likely to obtain the facts relevant to the matter in issue." 7 C.F.R. § 780.8(b). The reviewing authority has the discretion whether or not to permit the DTP participant to call witnesses or to cross-examine witnesses that testify at the hearing. The regulation states:

> The participant ... shall be given a full opportunity to present facts and information relevant to the matter in issue and may present oral or documentary evidence. *At its discretion*, the reviewing authority may request or permit persons other than those appearing on behalf of the participant to present information or evidence at such hearing and, in such event, *may permit the participant to question such persons.*

7 C.F.R. § 780.8(c) (emphasis added).

In this case, Doty's attorney repeatedly requested that Siekmann and the ASCS spotchecker, Steven Gniffke, be present to testify at both the state level hearing and before DASCO (R. 35, 72, 76). This request was never granted. In addition, neither the state committee nor DASCO allowed Doty the opportunity to cross-examine Siekmann, whose testimony formed the basis for DASCO's denial of Doty's appeal. In a case such as this where there are conflicting versions of the facts and testimony which is in direct conflict, in order to discern the truth as accurately as possible, agency discretion to permit or deny cross-examination of a pivotal witness is subject to abuse to a much greater extent than in most other aspects of informal hearings.

We find that DASCO's refusal to call Siekmann as a witness and to allow Doty to question him before the decision-makers was an abuse of the discretion granted by 7 C.F.R. § 780.8(c). We do not suggest that a reviewing authority must grant every request by a participant to call and cross-examine witnesses. Our holding is limited to the special circumstances of this case in which DASCO relied on the second version of events by a single witness with a possible motive to harm the participant when all other statements of persons with direct knowledge of relevant events were consistent with the participant's version of events and with the initial version of the single witness.

The state of the record reflects (1) Doty's unequivocal and consistent position that, to the best of his knowledge and belief as of October 30, 1987 and January 1989, all cattle on his farm at any time after January 1, 1986 had been destroyed and that any taking or switching of DTP cattle by Siekmann was without Doty's knowledge, (2) the unequivocal statement of John Christianson that he did no branding of Doty's cattle and received no animals from Doty's herd, (3) the unequivocal statement of James St. Aubin that he branded all of the cattle on Doty's farm, and (4) Lawrence St. Aubin's unequivocal statement that Siekmann told him that Doty knew nothing about the two Doty branded cattle Siekmann was keeping on the Lawrence St. Aubin farm after Doty's herd should have been slaughtered. Thus, all of the direct evidence in the record, except the second and third statements from Siekmann, would support Doty's position that he fully complied with all contract requirements and thus is entitled to payment of the contract and is not liable for penalties. Only the second and third statements from Siekmann contradict Doty's position.

Although the pertinent appeal regulation, 7 C.F.R. § 780.8(c), does not require that cross-examination be permitted whenever requested, the matter is within the discretion of the reviewing authority. Given the circumstances just outlined, in combination with the specific timely requests of Doty before both the state committee and DASCO hearings for the opportunity to cross-examine Siekmann, we hold that when DASCO, in the decision-making process, realized its inclination to rely on the revised statement of Siekmann, it was an abuse of procedural discretion not to permit appropriate cross-examination of Siekmann. Plainly, such abuse of discretion was not harmless in this case.[16]

Accordingly, the administrative record that currently exists is inadequate to support the penalties because it resulted from an abuse of discretion and consequent prej-

---

16. An agency is legally bound to follow its own regulations and commits procedural error if it fails to abide by them. *Service v. Dulles*, 354 U.S. 363, 379–80, 77 S.Ct. 1152, 1160–61, 1 L.Ed.2d 1403 (1957); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989) (affirming district court's finding that a determination by DASCO was procedurally defective under 7 C.F.R. Part 780). In addition to the procedural violation found in text, there were plain ASCS violations of technical requirements of the appeal regulations, but all appear to be harmless. We furnish the following examples:

Title 7 C.F.R. 780.8(d) states: "The reviewing authority shall have prepared a written record containing a clear, concise statement of the facts *as asserted by the participant* and material facts found by the reviewing authority. The names of interested persons appearing at the hearing shall be included." (Emphasis added.) The state committee decision from which Doty appealed to DASCO contained no findings of fact whatever, much less a clear, concise statement of facts as asserted by Doty (R. 62). Nor did the state committee decision cite any provision of the regulations when it imposed the penalties against Doty. Likewise, DASCO's determination contains no statement of the facts *as asserted by Doty* (R. 1–3). DASCO recites the facts according to Siekmann's written statement (his second revision of relevant events). DASCO then summarizes Doty's position as follows:

We understand your and your client's position to be that the county office took Mr. Siekmann's side in this matter, in opposition to your client's. You contend that the county office absolved the individual in whose possession the two branded cattle were found of all guilt and sought to penalize your client in excess of $100,000 in spite of the previously listed untruths and fallacies of the Siekmann story.

Rec. 2. This does not fulfill the regulation's requirement that DASCO make a clear, concise statement of the facts *as asserted by Doty*. Further, DASCO's decision did not include the names of the interested persons appearing at the hearing as required by § 780.8(d).

**632**

udicial violation of the appeal regulations. In any fair process of decision-making based on conflicting relevant evidence, it is axiomatic that the decision-maker is obligated to consider and resolve all versions of disputed facts before making a finding. Although there is no requirement that such consideration and resolution of conflicting evidence be expressed "out loud"—the decision-maker need only find the facts—it will be especially helpful to the court in this case to know the conflict-resolving rationale employed by the fact finder. It will greatly assist the court if any decision based on such findings of fact clearly set forth the reasoning supporting the decision. *See* 7 C.F.R. § 780.9(a) ("[t]he notification [of decision] shall clearly set forth the basis for the determination").

E. *Requirement of Actual Knowledge*

Because we have concluded that this matter should be reconsidered by the ASCS, we raise additional matters which may be relevant on remand.

■ DASCO found Doty in violation of 7 C.F.R. § 1430.461 and denied all payment under the contract. Section 1430.461 states in pertinent part:

(a) If CCC determines that any participating producer has erroneously represented any fact or has adopted, participated in, or benefitted from, any scheme or device which has the effect of, or is designed to, defeat the purpose of this subpart and/or the contract, no person shall be eligible for payments under the contract and all payments previously made to any person under the contract shall be refunded to CCC.

DASCO's decision was apparently based on the fact that Doty signed on October 30, 1987 the ASCS Form 315, Reconciliation of Dairy Cattle Disposal Numbers (R. 124), certifying that all dairy cattle in which he had an interest were either slaughtered or permanently exported and that he did not as of that date have any interest in dairy cattle or in the production of milk, whereas two milk producing cows (heifers at the time of Doty's DTP bid) bearing Doty's brand were thereafter found in Siekmann's possession on Lawrence St. Aubin's farm.

Doty's position is that he had no knowledge of the fact that two branded cattle were being milked by Siekmann after expiration of the contract when he was questioned by county executive director Hockert in January 1989, at which time he stated that all cattle included in the contract had been destroyed (R. 122). In order to find Doty in violation of 7 C.F.R. § 1430.461, DASCO would have to rely on evidence showing that Doty personally had actual knowledge at the time he signed the reconciliation of dairy cattle form that two branded cattle had not been slaughtered or exported. Otherwise, there would be no basis for determining that Doty had erroneously represented facts which had the effect of defeating the purpose of the contract.

DASCO also found Doty in violation of 7 C.F.R. § 1430.460 and imposed a civil penalty of $10,000. Section 1430.460(a)(3) states:

In addition to any other amount due CCC, each person who makes a false statement as to the number of dairy cattle that were sold for slaughter or export under a contract ... shall be subject to a civil penalty of not more than $5,000 for each head of cattle to which such statement applied.

■ Presumably, DASCO was again relying on the reconciliation of dairy cattle form signed by Doty in 1987 (R. 124). DASCO's decision states: "You [Doty's attorney] argued that your client had no knowledge of the two branded cows on Lawrence St. Aubin's farm. However, Mr. Siekmann was Mr. Doty's hired employee and the disposal of the cows was your client's responsibility." R. 2. DASCO cites no authority for the proposition that a DTP participant is liable for unlawful actions or misrepresentations of a former employee who was not a party to the contract and who may have been acting on his own account.

The DTP statute and regulations do not define "false statement" or "erroneous representation." However, the DTP statute provides: "Each person who *knowingly* violates any ... provision [other than marketing-penalty provisions] of this subsec-

tion, or any regulation issued under this subsection, shall be liable for a civil penalty of not more than $1,000 for each such violation." 7 U.S.C. § 1446(d)(5)(B)(i) (emphasis added).

The provision of the CCC Charter Act dealing with crimes and offenses indicates that making a false statement requires knowledge that the statement is false when made. It states:

> Whoever makes any statement *knowing it to be false*, ... for the purpose of influencing in any way the action of the Corporation, or for the purpose of obtaining for himself or another, money, property, or anything of value ... shall, upon conviction thereof, be punished....

15 U.S.C. § 714m(a) (emphasis added).

No successful action can be brought against a person under section 714m(a) unless the person making the alleged false statement knew it was false when the statement was made. *See Jacobs v. United States*, 359 F.2d 960 (8th Cir.1966). Although no action was brought against Doty under 15 U.S.C. § 714m(a), we see no reason why the underlying principles do not also apply to administrative action brought against participants pursuant to the regulations, i.e., in order to make a false statement, the person making the statement must know it to be false at the time it is made. Even in the absence of 15 U.S.C. § 714m(a), we would conclude that a reasonable interpretation of the regulations means that a person cannot make a "false statement" or an "erroneous representation" unless they know at the time that the information given is untrue. These terms must connote more than innocently incorrect statements.

In the present case, Doty alleges that the two branded cattle were taken from his property without his knowledge by Siekmann. Accordingly, it is apparent that Doty cannot automatically be held liable for the actions of Siekmann simply on the basis that Siekmann was a former employee. If Doty's allegation is true and Siekmann did convert the cattle in question to his own use, then Doty may not necessarily be held responsible for the loss caused to the CCC by Siekmann's actions. The regulatory provisions under which Doty was penalized require knowledge by him that he either erroneously represented facts or that he made false statements as to the number of cattle destroyed. Presumably, DASCO relied on Siekmann's statements for its conclusion, and we have held that this was an abuse of discretion absent the opportunity for Doty to confront and cross-examine Siekmann before the agency decision-makers.[17]

## IV

### A. *Order of Remand*

Title 28 U.S.C. § 1491(a)(2) provides in part: "In any case within its jurisdiction, the [United States Claims Court] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." RUSCC 60.1(a) provides in pertinent part:

> (1) *Issuance of Remand Order.* At the request of a party or on its own motion, the court may in any case within its jurisdiction by order remand appropriate matters to any administrative or executive body or official with such direction as may be deemed proper and just.

> (2) *Content of Remand Order.* An order of remand shall (A) delineate the area of further consideration or action deemed warranted on the remand, and (B) fix the extent to which, and the duration of the period, not to exceed 6

---

17. We are mindful that 7 U.S.C. § 1385 provides: "The facts constituting the basis for ... any loan, or price support operation, or the amount thereof, *when officially determined in conformity with the applicable regulations* prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government." (Emphasis added.) See Part II B in text. We deem our decision in text to be within this limitation since our holding is that DASCO's findings were not "determined in conformity with the applicable regulations." *See Esch v. Yuetter,* 876 F.2d 976, 991 (D.C.Cir.1989).

months, during which court proceedings shall be stayed.

. . . .

(5) *Advice of Administrative Action.* In every case in which an order of remand is entered pursuant to this rule, the attorney of record for the party so designated in the order of remand shall report to the court the status of proceedings on remand at intervals of 90 days or less, beginning with the date of the order.

Based on the foregoing opinion and in accord with the provisions just quoted, the decision by DASCO dated May 16, 1990 (R. 1–3) with respect to plaintiff's dairy termination program appeal, together with any other ASCS committee decision adverse to plaintiff, is hereby VACATED. Pursuant to RUSCC 60.1(a), this matter is hereby REMANDED to DASCO for further proceedings consistent with the foregoing opinion. Any further proceedings shall be conducted in accordance with the DTP statute, 7 U.S.C. § 1446(d), and regulations, 7 C.F.R. §§ 1430.450–.470, and in accord with the ASCS Appeal Regulations, 7 C.F.R. Part 780.

In such further proceedings, plaintiff James Doty shall be provided adequate opportunity for cross-examination of Lowell Siekmann (followed by the opportunity to submit rebuttal evidence) and, thereupon, new findings of fact and appropriate determination(s) based upon such findings shall be made. Specific findings of fact should be made concerning (1) the actual knowledge of plaintiff James Doty as of October 30, 1987 (date of ASCS 315 (R. 124)) pertaining to whether the two branded animals found on Lawrence St. Aubin's property in March 1989 had not been slaughtered or exported as required by contract, (2) the actual size and composition of Doty's herd that should have been set forth in his DTP bid, and (3) the actual knowledge of Doty (rather than implied knowledge based on actual knowledge of Siekmann) pertaining to any other animals which should have been slaughtered or exported but are found not to have been slaughtered or exported. It is recommended that consideration be given to the applicability of 7 C.F.R. § 791.2.

Not later than six months from the date of this opinion and order, DASCO shall file a report with the Clerk setting forth new findings of fact and determination(s) made pursuant to 7 C.F.R. Part 780, together with any other information deemed relevant by DASCO. The filing shall conform to RUSCC 60.1(b)(3).

The Clerk shall accomplish the action required by RUSCC 60.1(a)(3) & (4) (service of order and transmittal of administrative record).

Pursuant to RUSCC 60.1(a)(5), defendant is designated as the party to submit periodic status reports while this matter is on remand.

### B. *Disposition of Summary Judgment Motions*

Plaintiff's motion for summary judgment filed on January 7, 1991 is GRANTED to the extent set forth in the preceding Part IV A; to the extent that plaintiff's motion seeks a judgment or other disposition on the basis that DASCO's final decision dated May 16, 1990 was arbitrary, capricious, unreasonable, unsupported by substantial evidence or otherwise contrary to law, ruling on plaintiff's motion for summary judgment shall be withheld and proceedings thereon suspended pending completion of proceedings on remand; in all other respects, plaintiff's motion for summary judgment is DENIED. Ruling on defendant's cross-motion for summary judgment filed January 29, 1991 shall be withheld and proceedings thereon suspended pending completion of proceedings on remand.

### C. *Suspension of Court Proceedings*

This case is hereby SUSPENDED until completion of proceedings on remand and subsequent report to the court.